# IN RE AYERS.

# IN RE SCOTT.

# IN RE McCABE.

ORIGINAL.

Argued November 14, 15, 1887. — Decided December 5, 1887.

It is well settled in this court that, while the exercise of the power of punishment for contempt of their orders by courts of general jurisdiction is not subject to review by writ of error, or by appeal, yet, when a court of the United States undertakes, by its process of contempt, to punish a man for refusing to comply with an order which that court had no authority to make, the original order being void for want of jurisdiction, the order punishing for contempt is equally void; and if the proceeding for contempt result in imprisonment, this court will, by its writ of *habeas corpus*, discharge the prisoner.

Whether a State is the actual party defendant in a suit within the meaning of the 11th Amendment to the Constitution of the United States, is to be determined by a consideration of the nature of the case as presented by the whole record, and not, in every case, by a reference to the nominal parties of the record. *Osborn v. Bank of the United States*, 9 Wheat. 738, 857, explained and limited.

In order to secure the manifest purpose of the constitutional exemption guaranteed by the 11th Amendment, it should be interpreted not literally and too narrowly, but with the breadth and largeness necessary to enable it to accomplish its purpose; and must be held to cover, not only suits brought against a State by name, but those against its officers, agents, and representatives, where the State, though not named, is the real party against which the relief is asked and the judgment will operate.

If a bill in equity be brought against the officers and agents of a State, the nominal defendants having no personal interest in the subject-matter of the suit, and defending only as representing the State, and the relief prayed for is a decree that the defendants may be ordered to do and perform certain acts which, when done, will constitute a performance of an alleged contract of the State, it is a suit against the State for the specific performance of the contract within the terms of the 11th Amendment to the Constitution, although the State may not be named as a defendant; and, conversely, a bill for an injunction against such officers and agents, to restrain and enjoin them from acts which it is alleged they threaten to do, in pursuance of a statute of the State, in its name, and for its use,

and which if done would constitute a breach on the part of the State of an alleged contract between it and the complainants, is in like manner a suit against the State within the meaning of that Amendment, although the State may not be named as a party defendant.

The court does not intend to impinge upon the principle which justifies suits against individual defendants who, under color of the authority of unconstitutional state legislation, are guilty of personal trespasses and wrongs; nor to forbid suits against officers in their official capacity either to arrest or direct their official action by injunction or mandamus, where such suits are authorized by law, and the act to be done or omitted is purely ministerial, in the performance or omission of which the plaintiff has a legal interest.

A bill in equity was filed by aliens against the Auditor of the State of Virginia, its Attorney General, and various Commonwealth Attorneys for its counties, seeking to enjoin them from bringing and prosecuting suits in the name and for the use of the State, under the act of its General Assembly of May 12, 1887, against tax-payers reported to be delinquent, but who had tendered in payment of the taxes sought to be recovered in such suits, tax-receivable coupons cut from bonds of the State. An injunction having been granted according to the prayer of the bill, proceedings were taken against the Attorney General of the State and two Commonwealth Attorneys for contempt in disobeying the orders of the court in this respect, and they were fined and were committed until the fine should be paid and they should be purged of the contempt. *Held*, that the suit was a suit against the State of Virginia, within the meaning of the 11th Amendment to the Constitution of the United States, and was not within the jurisdiction of the courts of the United States; that the injunction granted by the Circuit Court was null and void; that the imprisonment of the officers of the State for an alleged contempt of the authority of the Circuit Court was illegal; and that the prisoners, being before this court on a writ of *habeas corpus*, should be discharged.

The Virginia act of 1877 concerning suits to collect taxes from persons who had tendered coupons in payment contains no provision as to the tender, or the proof of it, or the proof of the genuineness of the coupon, which violates legal or contract rights of the party sued.

If the holder of Virginia coupons, receivable in payment of state taxes, sells them, agreeing with the purchaser that they shall be so received by the State, the refusal of the State to receive them constitutes no injury to him for which he could sue the State, even if it were suable; and cannot be made the foundation for preventive relief in equity against officers of the State.

ON the 11th October, 1887, these petitioners each moved through his counsel for leave to file a petition for a writ of *habeas corpus*. On the 12th October leave was granted, and the writs were ordered to be made returnable on Monday, the

17th October. On the return day, return having been made, the court directed the prisoners to be placed in the custody of the marshal of the court. The same day a motion was made and argued, to release them on bail and to fix a day for hearing. On the 18th October the court ordered the prisoners to be released on their own recognizances, each in the sum of $1000, and assigned the cause for argument on the 14th day of the next November.

The case for argument and decision, as stated by the court, was as follows:

A writ of *habeas corpus*, directed to the Marshal of the United States for the Eastern District of Virginia, having heretofore been issued by this court on the application of Rufus A. Ayers, Attorney General of the State of Virginia, the marshal has made return thereto that the petitioner, whose body he produces, was in his custody and detained by him by virtue of an order, judgment, decree, and commitment of the Circuit Court of the United States for the Eastern District of Virginia, a certified copy of which is attached as a part of the return; and further returned that the petitioner had not paid, and refuses to pay, the fine imposed upon him by said order. The order of commitment, dated at Richmond, October 8, 1887, is as follows:

" *On Attachment for Contempt.*

" In the Circuit Court of the United States for the Eastern District of Virginia.

*In Re* RUFUS A. AYERS.

" This matter came on this day to be heard upon the rule heretofore issued against Rufus A. Ayers, Attorney General of the State of Virginia, to show cause why he should not be attached for contempt in disobeying the restraining order heretofore granted in the suit of *Cooper et al.* v. *Marye et al.* on the 6th day of June, 1887, and his answer thereto.

" On consideration whereof the court is of opinion and doth order and adjudge that the said Rufus A. Ayers is guilty of

contempt in his disobedience of said order, and that he do forthwith dismiss the suit of *The Commonwealth* v. *The Baltimore & Ohio Railroad Company*, instituted by him in the Circuit Court of the City of Richmond, and that for his said contempt he be fined the sum of $500, and stand committed in the custody of the marshal of this court until the same be paid and he purge himself of his contempt by dismissing said suit last herein mentioned."

A transcript of the proceedings, orders, and decrees of the Circuit Court of the United States for the Eastern District of Virginia in the suit of *Cooper et al.* v. *Marye et al.*, referred to in the order of commitment, is also produced, and set out in full as a part of the record in this matter. From that it appears that on June 6, 1887, James P. Cooper and others, suing on their own behalf and for all others similarly situated, being aliens, subjects of Great Britain, filed their bill of complaint in the Circuit Court of the United States for the Eastern District of Virginia against Morton Marye, Auditor of the State of Virginia, Rufus A. Ayers, the Attorney General thereof, and the Treasurers of counties, cities, and towns in Virginia, and the Commonwealth Attorneys of counties, cities, and towns in said State, whose names they prayed they might be allowed to insert in the bill as defendants when discovered.

In that bill it is alleged that, by an act of the General Assembly of Virginia, approved March 30, 1871, and another approved March 28, 1879, the State of Virginia had provided for the issue of a large number of bonds bearing interest coupons, which she thereby contracted should be received in payment of all taxes, debts, and demands due to her, of which large numbers, amounting to many millions of dollars, had been in fact issued; that said coupons, issued under both of said acts, are payable to bearer, and, both as a contract to pay interest and as a contract that they shall be received in payment of taxes, are negotiable instruments, free in the hands of any *bona fide* purchaser for value from any equity or burden whatever; that there are outstanding and overdue in the hands of the public at large more than four millions of dollars

of these overdue coupons; that, in pursuance of a plan subsequently conceived and adopted to destroy the marketable value of these coupons, the General Assembly of the State of Virginia, by the 15th section of an act dated February 14, 1882, forbade all the officers of the State to pay and redeem the same according to the tenor of the contract contained therein, and, by an act dated January 26, 1882, the collectors of taxes were forbidden to receive the same in payment of any taxes due to them; that, nevertheless, these statutes were declared by the Supreme Court of the United States to be unconstitutional and void; that thereafter the complainants, on the faith of said decision and the belief caused thereby that the said State would be utterly unable by any legislative enactment to impair the value of said coupons as a tender for taxes, had bought a large quantity of said coupons in the open money market of the city of London and elsewhere, amounting to more than one hundred thousand dollars nominally, at a cost of more than thirty thousand dollars; that this purchase was made for the purpose of selling said coupons to the tax-payers of Virginia, to be used by them as tenders for taxes due said State, the complainants believing that they would be able to sell said coupons to such tax-payers at a considerable advance on the price paid for them; many of which the complainants have sold to said tax-payers; that the General Assembly of Virginia enacted another statute, dated May 12, 1887, a copy of which is set out as an exhibit to the bill, whereby, as is alleged, "the treasurer of each county, city, and town in the State is ordered to furnish to the Commonwealth's attorney thereof a list of all persons who have tendered the said State's coupons in payment of their taxes, and said Commonwealth's attorneys are ordered to institute suits by summary proceedings in the name of said State against all such persons to recover a judgment against them for the amount of said taxes so previously due by them; that the said tax-payers are thereby required to submit to a judgment against them by default or to appear in court and plead a tender of said coupons, and then prove affirmatively that the coupons tendered by them are the State's coupons and not

counterfeit and spurious coupons, the burden of proving the same being placed upon the tax-payer and the coupon being taken to be *prima facie* spurious and counterfeit."

In the bill it is further alleged "that said act is repugnant to section ten of article one of the Constitution of the United States, for the reason that, taken in connection with said act before mentioned of January 26, 1882, it first commands the State's officers to refuse to receive those coupons which are undoubtedly her own as well as those which are spurious (and your orators charge that there are none such), and then commands her officers to bring said suits against those who have tendered said coupons of said State, as well as against those who have tendered spurious coupons; that it imposes upon the defendants heavy costs and fees, although all taxes due by them were paid by said tender, and it makes the judgment to be recovered in said suit a perpetual lien upon all the property of said tax-payer for said taxes, and for said costs and fees also, thus fixing a perpetual cloud upon the title of said tax-payer to his property."

It is further alleged in the bill, "that, by another act of the General Assembly of said State, approved January 26, 1886, it is provided that upon a trial of the issue to be made up under said act of May 12, 1887, the defendant shall produce the bond from which the coupon so tendered by him was cut, and prove that it was cut from said bond;" and that, as very few of said bonds are owned by persons residing in Virginia, the tax-payers would be utterly unable to produce said bonds, as required by said act.

It is further alleged therein, "that, by another act of said General Assembly, approved ——, 1886, it is provided that the tax-payer undertaking to prove said tender shall not be allowed to introduce expert evidence to prove the genuineness of said coupons, and all that have been issued under either of said acts are engraved only, as said acts provided they may be, and are not signed manually." Wherefore, it is alleged, that "said tax-payers who cannot produce said bonds will be utterly unable to prove their coupons to be genuine upon said trial, the State thus forcing them into a lawsuit in her own courts,

in which she has taken effectual precautions beforehand to make it impossible they can win, and to make it a legal certainty that they must lose when they cannot produce said bonds; that said act is a device and trick enacted to take away from and deprive said coupons of their value as tender for taxes."

It is further alleged therein that the Supreme Court of Appeals of the State of Virginia has decided that said last-named two acts, requiring said bonds to be produced, and forbidding the use of expert testimony, are valid laws, not repugnant to the Constitution of the United States.

It is further alleged in the bill, that, as the great bulk of the tax-payers of Virginia pay small sums, "if her officers are allowed to enforce said act of May 12, 1887, against them, the profit to be derived from purchasing your orators' coupons will be too small to induce them to do so, and, indeed, it will be impossible for them to use said coupons at all, except in the very limited cases in which they can produce said bonds;" and that "your orators will not only lose the profit which they had a right to expect they would make when they purchased said coupons, but they will be unable to sell them to Virginia's tax-payers at any price, and thus their entire property in the same will be destroyed; and your orators charge and aver that, in any event, unless they are granted the injunction hereinafter prayed for, they will lose a sum greater than $2000."

It is further charged in the bill "that the treasurer of each county, city, and town in said State is about to report to each Commonwealth's attorney the name of every tax-payer who has tendered coupons, and each Commonwealth's attorney is going at once to institute the suits provided for by said act of May 12, 1887, against persons holding coupons bought from your orators, as well as against all others; and they are informed and believe and so charge, that, in every case in which tenders of coupons have been made to the Auditor of the State, who is Morton Marye, (and many have been made to him,) the said Auditor, and Hon. R. A. Ayers, who is Attorney General thereof, are about to institute the suits

which said act provides for their instituting, whereby all coupons which your orators have sold to Virginia tax-payers will be condemned as spurious, although they are all genuine coupons issued by the State of Virginia, and all her tax-payers will be intimidated and deterred from buying from your orators and all others in the future any more of said coupons."

It is further charged in an amended bill " that acts of the General Assembly of the State of Virginia, which are repugnant to section 10 of Article I of the Constitution of the United States, commanded the treasurer of each county to levy on and sell the property of each tax-payer who has tendered coupons in payment of his taxes; and said acts also command said treasurers to return the real property of such tax-payers delinquent where no personal property can be found to be seized and sold; and your orators charge, therefore, that unless said officers are enjoined from bringing said suits hereinbefore described the treasurer of each county will proceed to execute said other unconstitutional acts by levying on such tax-payer's property, or by returning the same delinquent where no personal property can be found, thus creating a cloud upon the title of such tax-payer's property."

The prayer of the bill is that "the said Morton Marye, Auditor of Virginia, R. A. Ayers, the Attorney General thereof, and the treasurer and Commonwealth's attorney of each county, city, and town in the State of Virginia, may be made parties defendant hereto, and that they, their agents and attorneys, may be restrained and enjoined from bringing or commencing any suit provided for by said act of May 12, 1887, or from doing any other act to put said statute into force and effect, and that until the hearing of a motion for said injunction a restraining order may be made to that effect," and for general relief.

The act of May 12, 1887, set out as an exhibit to the bill, is as follows:

"An act to provide for the recovery, by motion, of taxes and certain debts due the Commonwealth, for the payment of which papers purporting to be genuine coupons of the Commonwealth have been tendered. (Approved May 12, 1887.)

"1. Be it enacted by the General Assembly of Virginia, that all taxes, including taxes on licenses, now due or which may hereafter become due to the Commonwealth, in payment of which any paper or instrument purporting to be a coupon detached from a bond of this State shall have been or may hereafter be tendered and not accepted as payment and not otherwise paid, may be recovered in the Circuit Court having jurisdiction over the county or corporation in which said taxes shall have been assessed, or if the tender was made to the auditor of public accounts in payment of taxes which he is authorized by law to receive, the said taxes may be recovered in the Circuit Court of the City of Richmond.

"2. The court shall have jurisdiction without regard to the amount of the taxes claimed and though the amount be less than twenty dollars.

"3. The proceeding shall be by motion, in the name of the Commonwealth, on ten days' notice, and shall be instituted and prosecuted by the attorney for the Commonwealth or corporation in which the proceeding is, or, if it be instituted by direction of the auditor of public accounts, in the Circuit Court of the City of Richmond.

"4. The notice may be served in any county or corporation in the State in the mode prescribed by the first section of chapter one hundred and sixty-four of the code (edition of eighteen hundred and seventy-three), or it may be served on any agent of the defendant in the county or corporation in which the proceeding is, and the word 'agent,' as here used, shall include any person who shall have made the tender aforesaid on behalf of the defendant, or if there be no known agent of the defendant in the said county or corporation it may be served by the publishing the same one time in some newspaper printed in the county or city where the tax was assessed, or if there be no paper printed in such county

or city then in some newspaper published in some county or city, nearest to the county or city where such tax was assessed.

"5. The motion may be tried or heard by the court or jury as motions in other civil cases. If the defendant relies on a tender of coupons as payment of the taxes claimed, he shall plead the same specifically and in writing, and file with the plea the coupons averred therein to have been tendered, and the clerk shall carefully preserve them. Upon such plea filed the burden of proving the tender and the genuineness of the coupons shall be on the defendant. If the tender and the genuineness of the coupons be established, judgment shall be for the defendant on the plea of tender. In such case the clerk shall write the word 'proved,' and thereunder his name in his official character, across the face of the coupons, and transmit them, together with a certificate of the court that they have been proven in the case, to the auditor of public accounts, who shall deliver the coupons to the second auditor, receiving therefor the check of the second auditor upon the treasurer, which check he shall pay into the treasury to the credit of the proper tax account.

"6. If the defendant fails in his defence and the taxes claimed are found to be due the State, any coupon filed by him with a plea of tender (and not spurious) shall be returned to him, and there shall be judgment for the Commonwealth for the aggregate amount of the taxes due and the interest thereon from the time they became due till the date of the judgment, with interest on the said aggregate amount from the date of the judgment until payment, and costs.

"7. No antecedent lien of the Commonwealth for the taxes for which any judgment is rendered shall be deemed to be merged in the judgment or otherwise impaired by the recovery of the same, but such lien shall continue in force notwithstanding the judgment.

"8. Every such judgment shall be docketed, as prescribed by law in other cases, and the clerk shall issue execution thereon, directed to the sheriff of any county (or sergeant of any city) who shall account for the money collected thereon to the auditor of public accounts.

"9. Should coupons be tendered the officer in satisfaction of said execution, he shall note the fact of such tender upon the execution and return it to the clerk's office; and thereupon the auditor of public accounts may direct an action to be brought upon the judgment. This action shall be instituted and prosecuted in the mode herein prescribed for actions to recover judgments for taxes, and similar actions may be instituted whenever coupons are tendered in satisfaction of any judgment obtained by the Commonwealth under the provisions of this act.

"10. The clerk of the court in which any such judgment is rendered, in behalf of the Commonwealth shall, as soon as it is rendered, transmit a certified abstract thereof to the auditor of public accounts, who shall record the same in a book to be kept for that purpose.

"11. Immediately after the passage of this act the county and city treasurers, and all other officers authorized by law to collect or receive money for taxes due the Commonwealth, including the license taxes, shall report to the Commonwealth's attorneys of their respective counties and cities, and also to the auditor of public accounts, the names of all persons assessed or liable therein for taxes due the Commonwealth who have heretofore tendered (otherwise than for identification and verification) coupons for such taxes, and which taxes remain unpaid, the amount of the taxes due, on what account, and when they become payable, and a description, as far as possible, of the coupons tendered, and when tendered; and they shall thereafter make like reports whenever and as soon as any such tender may be made. As soon as the auditor of public accounts shall receive such reports he shall credit the proper officer with the taxes named therein for which coupons were tendered.

"12. The attorneys for the Commonwealth, and the Attorney General, when it is his duty under this act to represent the Commonwealth in any case in the Circuit Court in the City of Richmond, upon such report being made to them, or whenever they are otherwise informed of any such tender having been made, shall forthwith institute and prosecute such proceedings as are hereinbefore required.

"13. In any case instituted under the provisions of this act, in which there is a judgment for the Commonwealth, a fee of ten dollars shall be allowed the attorney for the Commonwealth, or the Attorney General, as the case may be, which fee and fees of the clerk and other officers for services rendered in the case, as well as such other costs as are allowed by law in other cases in which the Commonwealth is a party, shall be taxed in the costs against the defendant. The Commonwealth shall not be liable for any fees or costs in any proceedings under this act.

"14. If any officer fail to perform any duty required of him by this act he shall be fined not less than one hundred dollars nor more than five hundred dollars.

"15. This act shall be in force from its passage."

On this bill the following order was made:

"Circuit Court of the United States for the Eastern District of Virginia.

"James P. Cooper, H. R. Beeton, F. J. Burt, N. J. Chinnery, W. M. Chinnery, F. P. Leon, and W. G. Woolston,

*against*

"Morton Marye, Auditor, R. A. Ayers, Attorney General, the Treasurers of Counties, Cities and Towns in Virginia, and the Commonwealth Attorneys of Counties, Cities and Towns in said State, whose names complainants have leave to insert as they may be discovered.

"Upon reading the bill of the complainants, it is ordered that Morton Marye, Auditor, R. A. Ayers, Attorney General, each and every treasurer of a county, city, or town in the State of Virginia, and each and every Commonwealth attorney for a county, city, or town in said State, be restrained from bringing or commencing any suit against any person who has tendered the State of Virginia's tax-receivable coupons in payment of taxes due to said State, as provided for and directed by the act of the Legislature of Virginia, approved May 12, 1887, described in the bill, and of which a copy is attached

thereto, and that each and all of said parties, their agents and attorneys, be restrained from doing any act to put said statute into force and effect until the further order of the court.

" And it is ordered that the motion for an injunction in this case be set down for hearing at the Circuit Court of the United States at Richmond, Virginia, on the first Monday in October next; provided that the Attorney General of the State of Virginia, or either of the defendants, may move the court for an earlier hearing thereof after ten days' written notice to the solicitor of the complainants; and provided further, that a copy of this bill and of this order be served on the Attorney General of the State of Virginia within ten days after the filing thereof."

"June 6, 1887."

A copy of this order, together with a copy of the bill, was served on the petitioner Ayers, the Attorney General of Virginia, on June 7, 1887.

On October 8, 1887, the following proceedings took place, viz.:

"And now, at this day, to wit, at a Circuit Court of the United States for the Eastern District of Virginia, held at Richmond, in said district, this 8th day of October, A.D. 1887.

"J. P Cooper and Others  
    *against*  } In Equity.  
Morton Marye, Auditor, &c., and Others.

"This cause came on this day to be heard upon the motion of the complainants for a preliminary injunction and was argued by counsel; upon consideration whereof it is adjudged, ordered, and decreed, for reasons stated in writing and made part of the record, that the injunction be issued as prayed. in the bill and remain in force until the' further order of the court.                  "HUGH L. BOND,

                                      "Circuit Judge.

"Thereupon the complainants, by counsel, called the attention of the court to the fact that the defendant, R. A. Ayers, Attorney General of the State of Virginia, was guilty of

contempt by his disobedience of the restraining order issued in this cause on 6th day of June, 1887, and the said R. A. Ayers, being called upon to answer in this behalf, filed in open court his answer in writing, which answer is in the words following to wit:

"Answer of Defendant R. A. Ayers.

" The answer of R. A. Ayers, Attorney General of the State of Virginia, to a rule awarded against him by this honorable court.

" To the Honorable Judge of the Circuit Court of the United States for the Eastern District of Virginia:

" By an order entered in the chancery cause of James P. Cooper et als. against Morton Marye and others, summoning him to show cause why he should not be fined and imprisoned for disobeying the injunction heretofore awarded in said suit, restraining him and others from instituting the suits required by an act of the General Assembly of Virginia, entitled 'An act to provide for the recovery by motion of taxes and certain debts due the Commonwealth, for the payment of which papers purporting to be genuine coupons of the Commonwealth have been tendered,' approved May 12, 1887, by instituting a suit against the Baltimore and Ohio Railroad Co., respondent, answering, says that he admits that he instituted the suit against the Baltimore and Ohio Railroad Company to recover taxes due by it to the State of Virginia after he had been served with the injunction order in this case; that he instituted the said suit because he was thereunto required by the act of the General Assembly of Virginia aforesaid, and because he believed this court had no jurisdiction whatever to award the injunction violated. Respondent disclaims any intention to treat the court with disrespect, and states that he has been actuated alone with the desire to have the law properly administered.

"R. A. AYERS,

"Att'y-Gen'l of Virginia.

" Subscribed and sworn to before me this 8th day of October 1887.                                    " M. F. PLEASANTS, Clerk."

And thereupon the order was made adjudging the petitioner guilty of contempt by his disobedience of said order, and requiring him forthwith to dismiss the suit of *The Commonwealth* v. *The Baltimore and Ohio Railroad Company*, instituted by him in the Circuit Court of the City of Richmond, fining him $500 for his contempt, and directing that he stand committed in the custody of the marshal of the court until the same be paid, and he purge himself of his contempt by dismissing said suit last mentioned.

In the same case, the proceedings resulting in the commitment and imprisonment of the petitioner John Scott, are as follows:

On August 23, 1887, on affidavit, showing that John Scott, attorney for the Commonwealth for Fauquier County, Virginia, had been served with a copy of the restraining order of June 6, 1887, and that in violation thereof he had brought certain suits against parties in said county, for the recovery of taxes alleged to be due by them to the State of Virginia for the year 1886, for which they had previously tendered tax-receivable coupons, said actions being brought under the act of the General Assembly of May 12, 1887, a rule was entered upon the said Scott to show cause, on September 22, 1887, why he should not be attached for contempt. On that day the said Scott answered the rule, justifying his action on the ground that the order which he had disobeyed was void for want of jurisdiction in the Circuit Court to make it. On September 24, 1887, in pursuance of leave given, the complainants filed an amendment to their bill, making Scott, as attorney for the Commonwealth for said County of Fauquier, a formal party defendant, and alleging that a judgment had been rendered against the defendant in each of the suits brought by the said Scott under the said act, a list of which, with the amounts of the several judgments, was set out.

Thereupon, on October 8, 1887, the following order was made: "The court, therefore, doth adjudge, order, and decree that, for his contempt of this court, said John Scott do pay a fine of $10, and dismiss the cases which he has brought in the Circuit Court of Fauquier County, Virginia, in violation of the

restraining order heretofore made in the cause of *Cooper and Others* v. *Marye and Others*, on the 6th day of June, 1887; and, further, that he enter satisfaction of the judgments heretofore obtained by him against the defendants in said causes, and that he stand committed to the custody of the marshal of this court until this order is obeyed, and the fine hereby imposed upon him is paid. And it is further ordered that the said John Scott do pay the costs of these proceedings."

Similar proceedings were had in respect to J. B. McCabe, the Commonwealth's attorney for Loudoun County, Virginia, the other petitioner. On July 11, 1887, an order was entered granting a rule against him to show cause why he should not be attached for an alleged contempt of the court in disobeying the restraining order made in the cause on June 6, 1887. Upon proof by affidavit that the said McCabe, as such attorney, had commenced proceedings under the act of May 12, 1887, to recover taxes alleged to be due to the State of Virginia from certain parties therein named, who had previously tendered tax-receivable coupons in payment thereof, he answered the rule, denying the validity of the order which he had violated; and thereupon, on October 8, 1887, the matter coming on to be heard, it was ordered and adjudged by the court "that the said J. B. McCabe is guilty of contempt in his disobedience of said order, and that he do forthwith dismiss all suits under the act of May 12, 1887, now pending in the Circuit Court of Loudoun County. And the court doth further order and adjudge, that the said J. B. McCabe, for his said contempt, be fined $100; that he be taken into the custody of the marshal of this court, and by him held until the said fine be paid, and he purge himself of the said contempt by dismissing the suits brought or prosecuted in violation of the restraining order of this court; and that he pay the costs of these proceedings."

*Mr. Roscoe Conkling* and *Mr. J. Randolph Tucker* for petitioners. *Mr. C. V. Meredith* and *Mr. W. W. Gordon* were with them on their brief.

I. The restraining order or injunction was to proceedings in a state court, and is beyond the jurisdiction of the court,

under the provisions of the act of Congress.   § 720, Rev. Stat.
This will readily appear.   By the judiciary act of 1789, c. 20,
§ 14, the power to issue writs by the circuit courts was limited
·by the words "Which may be necessary for the exercise of
their respective jurisdictions and agreeable to the usages and·
principles of law."   Rev. Stat. § 716.   The act of March .2,
1793, c. 22, § 5, provided that "The writ of injunction shall
not be granted by any court of the United States to stay pro-
ceedings in any court of a State."   The original power to
award injunctions in the Circuit Court of "the United States is
derived from these provisions and with this limitation.   In its
original grant it was as auxiliary to the exercise·of its juris-
diction.   The limitation by the act of March, 1793, was placed ,
upon it at the same session that· the Eleventh Amendment to
the Constitution was proposed, and both were conservative of
state exemption from Federal interference.   An exception to
this was afterwards made in the case of bankruptcy.·  Nor is
there any distinction between injunctions to stay proceedings
already begun, and injunctions to prevent their institution.
See *Daly* v. *Sheriff*, 1 Woods, 175; *Railroad Co.* v. *Scott*, 4
Woods, 386; *Fisk* v. *Union Pacific Railroad Co.*, 10 Blatch-
ford, 518; *In re Schwartz*, 14 Fed. Rep. 787; *Rens. & Sara-
toga Railroad* v. *Bennington, &c., Railroad*, 18 Fed. Rep. 617;
*Diggs* v. *Wolcott*, 4 Cranch, 179; *Peck* v. *Jenness;* 7 How. 612,
625; *Freeman* v. *Howe*, 24 How. 450; *Watson* v. *Jones*, 13
Wall. 679; *French* v. *Hay*, 22 Wall. 231, 250; *Haines* v. *Car-
penter*, 91 U.. S. 254; *Dial* v. *Reynolds*, 96 U. S. 340; *Dietzsch*
v.· *Huidekooper*, 103 U. S. 494.

II. Section 16 of the act of 1789 (Rev. Stat.' § 723) provides
that "suits in equity shall not be sustained in either of the
courts of the United States in any case where a plain, ade-
quate, and complete remedy may be had at law."   In *Baker*
v. *Biddle*, 1 Baldwin, 405, this was held to be an absolute
limitation on, the jurisdiction, and that any decree beyond this
jurisdiction was void.   We insist that the remedy in this case
at law, were the proceeding in a court of the United States,
would make this bill in equity of no force; but as against an
adequate remedy in a state court this injunction is null and of

no force, for reasons stated under the first point, and applicable here. The statute complained of provides for the defence by plea of tender and for trial by jury, and if the right of the defendant under the Constitution of the United States be infringed, his ultimate appeal to this court would protect him.

III. Complainants had no equity by their original bill or any of the amended bills. They are not tax-payers; they are speculators in coupons. No right as tax-payers to tender coupons is asserted in their behalf. In an amended bill and in one paper it appears that complainants sold coupons to tax-payers on a covenant to furnish counsel and save harmless the buyers. But this gives no equity to the complainants, as asserted in this case. This is shown by the decision of this court in *Carter* v. *Greenhow*, 114 U. S. 317. The case presented here as there is an abstract issue, not a practical one, until by judicial procedure the right of the tax-payer is denied. And in *Marye* v. *Parsons*, 114 U. S. 325, this court held that coupon-holders, if not tax-payers, could not have the benefit of injunction. It is *damnum absque injuria.* The complainants demand an abstract decree, not a practical remedy for any wrong to them, according to *Hagood* v. *Southern*, 117 U. S. 52. In the only cases referred to in the record of a tax-payer's complaint, it does not appear that the tax-payer asserted his right in the suits complained of and that his right was denied. The bill is without equity and the injunction utterly void.

IV. There is not only no equity in complainants, but if there were there is none against the defendants, your petitioners. They have no interest in the suits or in the taxes for which they are instituted. They are lawyers. The complainants have no equity to restrain an attorney from bringing a suit in a matter in which he is not interested. *Poore* v. *Clark*, 2 Atk. 515; *Cockburn* v. *Thompson*, 16 Ves. 321, 325; *Wilkins* v. *Fry*, 1 Meriv. 244, 262; *Kerr* v. *Watts*, 6 Wheat. 550; *Caldwell* v. *Taggart*, 4 Pet. 190; *Mechanics' Bank* v. *Seton*, 1 Pet. 299; *Story* v. *Livingston*, 13 Pet. 359; *McArthur* v. *Scott*, 113 U. S. 340; *Williams* v. *Bankhead*, 19 Wall. 563.

V. If the injunction be lawful, then was the commitment

lawful, or did it not transcend the power of the court? Conceding all that has thus far been controverted, we insist that the order of commitment was without authority.

This order is void, 1st, because it makes the term of imprisonment without end or determinable only upon an impossible condition; and, 2d, because it is really operative only on the right and interest of the State, who is not a party in this case and cannot be made one, but is decreed against by a duress of imprisonment on her officers, to violate their duty by destroying her rights.

*Osborn* v. *Bank of the United States*, 9 Wheat. 738, may be again cited in opposition to this position; but there the fund, the *res litigata*, was in the hands of the agent — here it never was.

VI. The only ground for this injunction is that the law of 1887 is unconstitutional, and that the authority thereby given to the Attorney General and other attorneys for the State is null and void.

This brings up the question, Is that law a violation of the Constitution of the United States?

For a moment look at the circumstances under which it was passed.

This court had decided that any levy by an officer after tender of genuine coupons, and not accepted, was illegal and made the officer a trespasser. The officer became a trespasser if he levied, and was liable to the State if he accepted coupons which turned out to be spurious, against which she had a clear right to protect herself. These treasurers in the country were not experts, and she might well distrust their judgment in receiving all which were tendered.

And when tendered and refused, the tax-payer retained the coupons and brought trespass in the Circuit Court of the United States, and recovered back in damages the tax paid by the levy. The State, paying these judgments for her officers, was without tax paid either in money or coupons; and the right of the State to these coupons so tendered and taken back has been denied, and none have ever been delivered by such tax-payers.

It is obvious that in this state of things, the same coupon might serve as a tender for many tax-payers, in fraud of the right of the State to have her taxes paid in money or in these coupons.

To avoid all this — to compel the tax-payer to pay in coupons what taxes he refused to pay in money, to verify the genuineness of the coupons tendered, and to forbear the *ex parte* procedure by levy — the statute of May 12, 1887, was passed.

On its face, in its preamble, in the procedure provided, there is no taint of unconstitutionality, according to the rulings of this court. See *Murray* v. *Hoboken Co.*, 18 How. 272; *Collector* v. *Day*, 11 Wall. 113; *Antoni* v. *Greenhow*, 107 U. S. 769; *Bissell* v. *Heyward*, 96 U. S. 580.

VII. This is a suit in fact against the State of Virginia, and all proceedings are null and void. It makes the Attorney General and all attorneys for the Commonwealth parties defendant as such officers. It compels them, not as ministerial but as discretionary officers, to regulate their official action by the will of a Federal judge. It takes them away from their duties and imprisons them until they surrender the suits and judgments of the State, and compels the State into the alternative of accepting what is tendered in taxes, whether spurious or not, or taking nothing. It has driven the State from levy for her taxes and now seeks to exclude her from her own courts as a suitor. If this is not a breach upon the immunity of the State under the Eleventh Amendment, what is its value?

A historical epitome of the proposal and adoption of this amendment is pertinent to this inquiry. Alexander Hamilton, in the 81st number of the Federalist, discusses the question whether a State can be sued in the Federal courts by a citizen of another State. He seems to treat the possibility of her being sued by one of her own citizens as too remote even for hypothesis. He declares the fear of such a construction is chimerical.

But within a few years after the Government went into operation the Supreme Court, in *Chisholm* v. *Georgia*, 2 Dall. 419, entered judgment for a citizen against a State. Many

such suits were pending in this court, most of them, perhaps all, by citizens of another State against one of the States. The original records in this court show the following: *Huger* v. *South Carolina, Oswald* v. *New York, Vassall* v. *Massachusetts, Von Stophust* v. *Maryland, Cutting* v. *South Carolina, Hollingsworth* v. *Virginia, Grayson* v. *Virginia.*

The judgment in *Chisholm* v. *Georgia* was rendered on the 18th of February, 1793. Great alarm was produced among the States by this decision, and on the 20th of February, 1793, an amendment was proposed in the Senate of the United States which read:

"The judicial power shall not extend to any suits in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign State." Its consideration was delayed until January 21, 1794, when it had assumed the form it now has.

"The judicial power shall *not be construed* to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

Mr. Gallatin proposed an amendment, "Except in cases arising under treaties made under the authority of the United States." This was voted down.

On the same day an amendment was proposed so that the article would read thus: "The judicial power of the United States extends to all cases in law or equity in which one of the United States is a party, but none shall be prosecuted where the cause of action shall have arisen before the ratification of this amendment." This was voted down. The amendment as finally adopted was then passed by the Senate — ayes, 23; noes, 2.

It went to the House of Representatives. An amendment was proposed there in these words: "When each State shall have previously made provision in their own courts whereby such suit may be prosecuted to effect." Voted down — ayes, 8; noes, 77. The Eleventh Amendment was then adopted by the House: ayes, 81; noes, 9. It may be well to notice in passing that on the 2d March, 1793, the act passed Congress

which forbade injunctions by a Federal court to stay proceedings in a state court.

The amendment was ratified in 1798. In *Grayson* v. *Virginia*, 3 Dall. 320, this court directed process against Virginia to be served on the Governor and *Attorney General* of the State. In *Hollingsworth* v. *Virginia*, 3 Dall. 378, the court unanimously dismissed all pending suits against States on its docket as being forbidden by the Eleventh Amendment.

This historic statement justifies the following conclusions: (1) It shows that by the Constitution makers it was ordained that the original Constitution *should not be construed* (as it had been in *Chisholm* v. *Georgia*) to extend to any suit by a citizen of one State, or foreign subjects against a State. (2) If any of these suits were those of citizens against his own State (as it may have been from the names of the plaintiffs in *Huger* v. *South Carolina* and *Grayson* v. *Virginia*) they, with those against a State by parties not citizens thereof, were equally condemned by this amendment.

This amendment is an authoritative interpretation of the original Constitution. It was an imperative mandate to the judiciary not to *construe* their jurisdiction so as to entertain such suits. It was a recoil from such a construction in the interests of the immunity of a member of the Union from being impleaded in a Federal court by any person whatever. How, then, should it be construed by this court now?

The answer seems plain. It should be interpreted in favor of the immunity, and to defeat every device which would destroy or impair it. The court should not see how near an approach a suit may make to the fences which constitute the immunity, but how far it must keep away, lest it trench upon the sovereignty of the State. Devices which do not assail directly, but which furtively and adroitly avoid the thing forbidden in form, but do the thing substantially and in effect, must be condemned as contrary to its true purpose and meaning.

We hold that this is an injunction against the State in fact:

1. Because, as already indicated, it destroys an essential function of State autonomy — *the power to sue her debtor in*

*her own court and by her own officers.* It imprisons them for asserting her right as her law officers. *Collector* v. *Day,* 11 Wall. 113, is conclusive on this point. If the State can *only* sue by such professional attorneys, is not an injunction upon the only possible agency through which the invisible, immaterial State can act, a clear destruction *pro tanto* of State autonomy? As you cannot enjoin a State from suing — as you cannot serve the injunction, if you could do so, on an invisible and intangible entity, as she can only exert this function by human agencies — can there be a doubt that in cutting these off you leave the State maimed and helpless, a sovereign without will and without capacity to act? In fact it is obvious that to constrain her you must constrain these agencies, the *sine qua non* of her action; and, if this be so, how is this amendment of avail if, unable to touch her, you cut off her only means of acting?

2. In suing the executive officer, the Attorney General (on whom, as a representative of the State, in *Grayson* v. *Virginia,* this court ordered process against the State to be served), you sue the State; you enjoin it. In the Virginia cases, 100 U. S. 303–370, this court held that every officer of a State who acted for the State in the execution of its laws was the State under the Fourteenth Amendment. Shall the State be bound for their act and yet their act not be the State's under the immunity of the Eleventh Amendment? Suppose an injunction was granted against the Attorney General and all District Attorneys of th United States to prevent suits in the name of the United States, could there be a doubt that that would be an injunction upon the Government? See *United States* v. *McLemore,* 4 How. 286; *Hill* v. *United States,* 9 How. 386; *Mississippi* v. *Johnson,* 4 Wall. 475; *Georgia* v. *Stanton,* 6 Wall. 50.

3. This decree interferes with the discretion of these officers, and they are not merely ministerial officers. Let it be remembered, no suit is ordered under this law against any man *who has paid his taxes.* The law is explicit on this point. The Attorney General and other attorneys are discretionary officers, charged with functions which demand intelligent discre-

tion. In such cases they are held to be the *State*. See *Board of Liquidation* v. *McComb*, 92 U. S. 531; *Cunningham* · v. *Macon, &c., Railroad*, 109 U. S. 446, and cases reviewed. Where the mind and will of the State (the invisible sovereign) operate through the mind and will and according to the discretion of its officers, they are the State and must be so held, or the Eleventh Amendment means nothing. See *Louisiana* v. *Jumel*, 107 U. S. 711; *Antoni* v. *Greenhow*, 107 U. S. 769; *Hagood* v. *Southern*, 117 U. S. 52. This last case is very pertinent, for the suit and decree were against the officers in their official capacity and operated on their discretion.

4. The *Virginia Coupon Cases*, 114 U. S. 269, are cited against the views presented. In these cases the majority of the court based their conclusions on several grounds: (1) The officer was ministerial; but in this case there is discretion. (2) In that case there was actual taking of property, which was trespass unless justified by *respondeat superior*, which was denied him. In that case the officer seized and held property. In this case he holds and has seized none; he only sues one who is a confessed debtor: but if he did not so confess, merely suing is no trespass and no invasion of right which a valid plea at law will redress. The officer in that case might, *ex mero motu*, have trespassed. Here the attorney cannot, for there is no trespass, and he has no interest and takes none. (3) In that case the officer made the aggression on the citizen, for which the court held he should have redress. In this case he makes none; he summons him who is a debtor to try whether he ought on his tender to be discharged. Clearly the coupon cases do not govern this. This strikes at the very citadel of the State's immunity. A levy without right is trespass. A suit without good ground is not a wrong of which a party can complain if his defence is allowed, for which he can enjoin. Virginia has a right to sue, giving her citizens a fair trial, and doing so neither she nor her officers can be enjoined.

VIII. The prisoners must be discharged upon either of two grounds: (1) If the court, on any ground previously maintained, was without jurisdiction or transcended its jurisdiction (as in the imprisonment until the prisoner did the impossible

or improper thing), this court will discharge. *Ex parte Parks*, 93 U. S. 18, 23 ; *Ex parte Wilson*, 114 U. S. 417; *Ex parte Curtis*, 106 U. S. 371; *Ex parte Carll*, 106 U. S. 521; *Ex parte Bigelow*, 113 U. S. 328; *Ex parte Fisk*, 113 U. S. 713; *Ex parte Yarbrough*, 110 U. S. 651; *Ex parte Virginia*, 100 U. S. 339, 343; *Ex parte Siebold*, 100 U. S. 371; *Ex parte Harding*, 120 U. S. 782; *Ex parte Bain*, 121 U. S. 1: or, (2) In a case where this court has appellate power ultimately, on final decree and on interlocutory proceedings, liberty is unjustly taken away and contrary to equity, but within jurisdictional power, we insist that there is no good reason why, *in favorem libertatis*, this court should not grant release under *habeas corpus*. If not, the deprivation might continue until the final decree.

*Mr. C. V. Meredith* filed a separate brief for petitioners, citing : I. As to the nature of remedy by *habeas corpus*, *Ex parte Fisk*, 113 U. S. 713; *Ex parte Virginia*, 100 U. S. 339; *Ex parte Rowland*, 104 U. S. 604. II. That the Virginia statute was not unconstitutional, *Antoni* v. *Greenhow*, 107 U. S. 769; *Poindexter* v. *Greenhow*, 114 U. S. 270; *Rutherford* v. *Greene*, 2 Wheat. 196; *Supervisors* v. *Brogden*, 112 U. S. 261; *Beers* v. *Arkansas*, 20 How. 527; *Bank of Washington* v. *Arkansas*, 20 How. 530; *United States* v. *Dickson*, 15 Pet. 141, 165; *Lynchburg* v. *Railroad Co.*, 80 Virginia, 237; *Shepherd* v. *Frys*, 3 Grattan, 442; *Tennessee* v. *Sneed*, 96 U. S. 69; *Newsom* v. *Thornton*, 66 Ala. 311; *Savings Bank* v. *United States*, 19 Wall. 227. III. That the burden of proving the genuineness of the coupons was a common law burden thrown upon the person tendering them, *Shepherd* v. *Frys*, *supra*. IV. That expert testimony was not admissible to prove their genuineness, *Rowt* v. *Rile*, 1 Leigh, 216; *Harriot* v. *Sherwood*, Va. Law Journal, 1884, p. 107; *Burress* v. *Commonwealth*, 27 Grattan, 934; or, if admissible, did not form part of the contract, *Ogden* v. *Saunders*, 12 Wheat. 213, 350; *Griffith* v. *Williams*, 1 Cr. & Jer. 47; *Moore* v. *United States*, 91 U. S. 270. V. That the suit was against the State. On this point the brief said : The question as to what is a suit

against a State, has been so frequently discussed here, and so frequently decided by this court, that no discussion, in opposition to the decisions of this court, will be indulged in this brief. So far as the positions assumed in this brief are concerned, it is not deemed necessary to ask for the slightest modification of any of the principles announced in those decisions. Here those principles will be recognized as *stare decisis*.

The question as to what is a suit against a State, first arose after the adoption of the Eleventh Amendment to the Constitution in the case of *Osborn* v. *Bank of the United States,* 9 Wheat. 738. As to that decision we submit: (1) That the case did not call for a decision of the question, because the Bank was not an individual, but a part of the government of the United States. It was held in *McCulloch* v. *Maryland,* 4 Wheat. 316, that the Bank was an instrument which was "necessary and proper for carrying into effect the powers vested in the government of the United States." That construction was reaffirmed in *Osborn* v. *Bank of the United States.* See p. 860. There is no provision of the United States Constitution preventing the National Government from suing a State. No decision therefore of the question was called for by the case. (2) We insist that this court has repeatedly overruled the announcement made in that case that "the Eleventh Amendment which restrains the jurisdiction granted by the Constitution over suits against the State, is, of necessity, limited to those suits in which a State is a party *on the record."* It is true that that guide was recognized in *Davis* v. *Gray,* 16 Wall. 203, 220. But this latter case has been spoken of by this court as going to the extreme limit of jurisdiction. Notwithstanding this recognition, we insist that the test, so announced, has frequently been disregarded by this court. See *Woodruff* v. *Trapnall,* 10 How. 190; *Curran* v. *Arkansas,* 15 How. 304; *State Bank of Ohio* v. *Knoop,* 16 How. 369; *Board of Liquidation* v. *McComb,* 92 U. S. 531; *Kendall* v. *United States,* 12 Pet. 524, 613; *Decatur* v. *Paulding,* 14 Pet. 497; *United States* v. *Seamen,* 17 How. 225, 230; *United States* v. *Guthrie,* 17 How. 284; *Mississippi* v. *Johnson,* 4 Wall. 475, 498; *Gaines* v. *Thompson,* 7 Wall. 347; *Litch-*

*field* v. *Register*, 9 Wall. 575; *Secretary* v. *McGarrahan*, 9 Wall. 298; *Louisiana* v. *Jumel*, 107 U. S. 711; *Poindexter* v. *Greenhow*, 114 U. S. 270. There this court, by a majority opinion, delivered by Mr. Justice Matthews, held that that suit was not one against a State, and enumerated the tests by which this court decides whether a suit is against a State or not. The tests are as follows: (1) Whether a State is named as a party on the record; (2) Whether the action is directly upon the contract; (3) Whether the suit was brought to control the discretion of an executive officer of a State; (4) Whether the suit was brought for the purpose of administering the funds actually in the public treasury; (5) Whether it is an attempt to compel officers of the State to do acts which constitute a performance of its contract by the State; (6) Where the case is such that the State is a necessary party, that the defendant may by protected from liability to it.

As the minority of this court held in the case just cited that that case was one against a State, it cannot be presumed that they were of opinion that the tests just enumerated should be more limited. It can therefore be regarded that any case that comes within the said tests is held by this court to be a suit against a State. We insist, so far as this brief claims, that the suit of complainants comes within the third and fifth tests.

This court has repeatedly decided what is a ministerial act, and what is one requiring the exercise of official discretion. See *United States* v. *Guthrie*, 17 How. 284; *Gaines* v. *Thompson*, 7 Wall. 347; *Mississippi* v. *Johnson*, 4 Wall. 475; *Litchfield* v. *Register, &c.*, 9 Wall. 575; *Secretary* v. *McGarrahan*, 9 Wall. 298; *United States* v. *Seamen*, 17 How. 225; *Decatur* v. *Paulding*, 14 Pet. 497.

In this case the State, though nominally not a party, is substantially the real party against whom the relief is asked, within the principle laid down by this court in *Hagood* v. *Southern*, 117 U. S. 52. The bill shows no personal claim against any of the defendants. It does not allege that any one of them proposes to commit a trespass, in this differing from *Allen* v. *Baltimore & Ohio Railroad*, 114 U. S. 311.

VI. The bill is without equity and should have been dismissed, *Parsons* v. *Marye*, 114 U. S. 327 ; *Hagood* v. *Southern*, *supra*.

The counsel for petitioners also filed with their brief, a copy of the brief of *Mr. John A. Campbell*, and *Mr. J. C. Egan*, in *New Hampshire* v. *Louisiana* and *New York* v. *Louisiana*, 108 U. S. 76.

*Mr. D. H. Chamberlain* and *Mr. William L. Royall*, opposing.

It will not be disputed that the only question arising now upon this record, is that of the jurisdiction of the court below to make the restraining order of June 6th, 1887. This question will depend upon : (1) The constitutional and statutory jurisdiction given to the United States Circuit Courts ; (2) the sufficiency of the averments of the bill ; and (3) the subject matter of the suit. · It is believed that all the questions which can be considered in determining the general question of jurisdiction of the court below in these proceedings, can be determined without difficulty and by the simple application of cases already decided by this court.

The chief peculiarity of these present cases is found in the fact that the defendants in the original bill — the petitioners in the present proceedings — are *officers of the State of Virginia*. This fact suggests the foremost, if not the most important, question to be considered.

I. Stripped of all disguises and reduced to its simplest statement, the question which arises under this view of the case is, *May a state officer be enjoined by the United States Circuit Court from doing what an unconstitutional state statute directs him to do ?*

Attention is called to this statement of the issue, for it is believed to express every consideration which is really involved in these cases.

What may be described as *two lines of cases*, bearing on this question, appear in the reported decisions of this court. One line, which tends to restrict the right of the courts to act upon

state officers for the enforcement of duties and obligations of the State towards private parties. Another line, which tends to maintain such right and to enforce it somewhat broadly and fully.

These two lines of cases are marked in general by the distinction of *strict* and *liberal* construction which has prevailed so extensively and steadily in our judicial and political history; a distinction which is natural and inevitable, arising from the nature of human language as well as from the nature of the human mind.

The leading case in the first line of cases above referred to may be said to be the case of *Louisiana* v. *Jumel*, 107 U. S. 711, decided by this court in 1882. The Legislature of Louisiana, by a statute of 1874, provided for an issue of state bonds for the purpose of refunding an existing series of state bonds. This act provided in terms for the levy annually of a tax of $5\frac{1}{2}$ mills on the dollar on the assessed value of all real and personal property in the State for the purpose of paying the interest and principal of these new bonds. The funds derived from this levy were directed to be kept apart and appropriated to that purpose and no other; and it was made a felony for any agent or officer or liquidator of the State to divert said funds from such purpose. This tax was further made "a continuing annual tax" until the principal and interest of the bonds should be paid or redeemed; and the appropriation of said funds was made "a continuing annual appropriation" during the same period; and it was made the duty of the officers, specified in the act, "to collect said tax annually and pay said interest and redeem said bonds until the same shall be fully discharged." It was further provided in the same act that each provision of the act should be, and was declared to be, a contract between the State of Louisiana and each and every holder of such bonds.

Shortly after the passage of this act, the State adopted an amendment to its constitution declaring the said issue of bonds "to create a valid contract between the State and each and every holder of said bonds which the State shall by no means and in no wise impair." And the said bonds were declared to

be "a valid obligation of the State in favor of any holder thereof." And the courts were forbidden to enjoin the payment of the principal or interest thereof, or the levy and collection of the tax therefor.

In January, 1880, a new constitution of Louisiana went into effect, by which it was provided that the interest on the bonds issued under the act of 1874, which bore 7 per cent interest, should be fixed at 2 per cent for five years, 3 per cent for fifteen years thereafter, and 4 per cent thereafter, and limiting the annual tax for the payment of said interest to three mills. The new constitution further provided that the coupons of the bonds of 1874, falling due January 1, 1880, should be remitted and "any interest taxes collected to meet said coupons are hereby transferred to defray the expenses of the state government."

This case thus presented (1) a contract between the State and individuals holding her bonds, whereby interest at 7 per cent was secured to the holders by a perpetual levy and appropriation of taxes; (2) a subsequent constitutional enactment reducing the rate of interest without the consent of the bondholders, and diverting funds already raised and in the treasury, from the payment of the interest to which they had been originally pledged and devoted.

This court in its opinion cited and commented upon *Osborn* v. *Bank of the United States*, 9 Wheat. 738; *Davis* v. *Gray*, 16 Wall. 203; *Board of Liquidation* v. *McComb*, 92 U. S. 531; and *United States* v. *Lee*, 106 U. S. 196. The scope and limit of its decision are clear. The suits were suits, in the judgment of this court, not only to compel a State to execute its contract, but to compel it "by assuming the control of the administration of the fiscal affairs of the State to the extent that may be necessary to accomplish the end in view;" that is to say, to the extent (1) of restraining the fiscal officers of the State from applying the taxes collected to the use to which they were devoted by the legislation of 1879; and (2) of compelling such officers to apply said funds to the payment of the principal and interest of the bonds as required by the legislation of 1874.

The case of *Antoni* v. *Greenhow*, 107 U. S. 769, followed immediately. It was a petition for mandamus by Antoni against the treasurer of the city of Richmond, to compel him to accept in payment of taxes, a coupon of the bond issue of 1871, which, by the terms of the act authorizing the issue, was made "receivable by all tax collectors in payment of all taxes, debts and demands due the State."

In 1882, the State of Virginia had passed an act providing, in substance, that upon the tender of coupons in payment of taxes, the tax collectors should receive the same for the purpose of "identification and verification," and, at the same time, should require the tax-payer to pay his taxes in current funds; and upon such payment the tax-payer might bring his suit against the Commonwealth, and thereupon an issue should be tried by a jury, whether the coupons tendered were genuine legal coupons, and upon a decision of this issue in favor of the tax-payer, and a judgment in his favor, the money already paid by him for taxes should be repaid to him out of the treasury. The act further provided that when a mandamus should be brought to compel a tax collector to receive coupons for taxes, the tax-payer should be required, first to pay his taxes in money, and thereupon an issue should be framed as to whether the coupons tendered were genuine coupons; and upon a final decision of this issue in favor of the tax-payer, a mandamus should issue requiring the coupons to be received, and thereupon the money already paid by the tax-payer should be refunded to him.

From a careful study of this case it will thus be seen that, as presented by the opinion of the court, it decides no question as to the amenability of state officers to judicial process, either for the enforcement, or protection against impairment, of a state contract; and that the opinion of a minority concurring in the judgment of the court goes only to the extent of holding that there is no remedy *against the State itself*: and that a suit *to compel state officers to do acts which constitute a performance of its contract*, is a suit against a State itself.

The case of *Cunningham* v. *Macon & Brunswick Railroad*

*Co.*, 109 U. S. 446, decided at October Term, 1883, was a suit by a citizen of the State of Virginia against the Governor. and Treasurer of the State of Georgia, the defendant railroad company, and certain directors of the company and other citizens of the State of Georgia. In that case the State of Georgia had endorsed the bonds of the railroad company, and taken a lien upon the road as its security. The company having failed to pay interest, the Governor took possession of the road and put it in the hands of a receiver, who sold it to the State. The State then took possession of the road, and substituted its own bonds in the place of the endorsed bonds of the company. The holders of second mortgage bonds of the same company, issued after the State's endorsement of the former bonds and before the company's default in interest, filed a bill in equity to foreclose their mortgage and to set aside the former sale to the State, and to be let in as prior in lien. The state officers — Governor and Treasurer — demurred, and the court below dismissed the bill.

In deciding this case, the court examined the general question of judicial proceedings affecting a State, to which the State was not a party, and made the following general classification of the previous cases: (1) Cases where property of the State, or property in which the State had an interest, came before the court or under its control without being taken forcibly from the possession of the government, where the State might, if it chose, intervene to claim or protect its rights. (2) Where an individual was sued in tort for some act injurious to another, in regard to person or property, where his defence was that he acted under the orders of the government. In these cases, the court said: he is not sued as, or because he "is, the officer of the government, but as an individual, and the court is not ousted of jurisdiction because he *asserts* authority as such officer. To make out his defence he must show that his authority was sufficient in law to protect him," and to this class the court assigned the case of the *United States* v. *Lee,* 106 U. S. 196. (3) Cases where "the law has imposed upon an officer of the Government a well-defined duty in regard to a specific matter not affecting the general

powers or functions of the Government, but in the performance of which one or more individuals have a distinct interest, capable of enforcement by judicial process." Under this last head, the court referred to the case of *Davis* v. *Gray*, 16 Wall. 203, and remarked that "It is clear that in enjoining the Governor of the State in the performance of one of his executive functions, the case goes to the verge of sound doctrine."

In *Hagood* v. *Southern*, 117 U. S. 52, a suit in equity was brought by the assignees of the Blue Ridge Railroad Company against the Comptroller General of the State of South Carolina, and the several County Treasurers within the State, praying that the defendants, the County Treasurers, "may be decreed to receive the said revenue bond scrip in payment of said taxes due by your orator to the State of South Carolina, and that on their refusal to do so, they may be enjoined from enforcing the said tax by selling the property of your orators or in any other manner, and that, on such refusal, the lien of said taxes on the property of your orators may be declared to be discharged." The court said: "The case thus comes directly within the authority of *Louisiana* v. *Jumel*, 107 U. S. 711. . . . In the present cases the decrees were not only against the defendants in their official capacity, but, that there might be no mistake as to the nature and extent of the duty to be performed, also against their successors in office." And it proceeded to point out the distinction between this case and *Osborn* v. *Bank of the United States, Davis* v. *Gray, Board of Liquidation* v. *McComb*, and *Allen* v. *Baltimore & Ohio Railroad Co.*

The cases now examined are all the cases in this court which, in our judgment, can be said to belong to that line of cases which we have described as restricting or delimiting the extent to which the judicial process may be applied for the protection of contract rights, invoked on behalf of private complainants. The boundaries which these cases mark out are as distinct, probably, as the nature of the subject admits of. Stated in a condensed form, they go to the extent of declaring: (1) That when positive affirmative relief is sought, by the enforcement, through judicial process, of a

State's contracts, although the state officers only are the defendants, the suit is in substance a suit against the State, and barred by the 11th Amendment; (2) That when the relief sought, as in *Louisiana* v. *Jumel*, goes to the extent of requiring the courts to virtually assume control and administration of a part of the executive functions of the state government, the suit is not only in substance against the State, but it calls for a usurpation by the courts of the functions of the political sovereign.

We turn now to the second line of cases which we have described as maintaining somewhat broadly and fully the right and duty of the courts to exercise the judicial power in protecting rights embodied in state contracts, and guarded by the Constitution of the United States.

The earliest and most commanding authority, as well as, perhaps, the amplest expression of the judicial power and duty in such cases, is *Osborn* v. *Bank of the United States*, 9 Wheat. 738. We do not hesitate to say, with boldness and a high degree of confidence, that we rely upon that case as warranting all the relief which was sought in the suit below out of which these proceedings have sprung. The court is here presented with the printed record at large of this case, as it lies in the archives of this court, which shows more fully than the report in Wheaton, that, on all points, it is an express authority in support of the positions of the complainants in this bill.

[The counsel referred to a printed copy of that record, which had been filed in this case. After reviewing that case at length, counsel continued :]

It is sometimes sought to minimize the scope and force of this decision by representing it as affecting only the question of *the restoration of the money seized from the bank*. An examination of the case shows, as we have seen, that the decree below not only decreed the restoration of the funds seized, but decreed a perpetual injunction against the defendants, state officers, " from proceeding to collect any tax which has accrued or may hereafter accrue from the complainants, *under the act of the General Assembly of Ohio, in the bill and proceedings mentioned.*" In other words, the state officers were forever

enjoined from carrying into effect, or executing, the statute in question, *a statute which commanded them in terms to do what the Circuit Court enjoined.* The succession of human events seldom presents two cases more nearly identical in principle than *Osborn* v. *Bank of the United States,* and the present case, — an identity stronger and more controlling than any identity of mere facts, — and on the authority of that case we rest this.

The next important case involving similar questions in this court, is *Davis* v. *Gray,* 16 Wall. 203. In that case, a person who had been appointed receiver of a railroad holding a large grant of lands, made to it by the State, sought to enjoin the officers of the State which, by the adoption of a new constitution, had declared said grant forfeited to the State, for the benefit of its school fund, from granting said lands to other persons. The suit was brought against Davis, Governor of the State, and Keuchler, Land Commissioner of the State. These facts make the case even stronger or more emphatic, in its direction, than *Osborn* v. *Bank of the United States.*

The case was decided here in 1872, the Chief Justice and one Associate Justice dissenting. The court held that a Circuit Court of the United States, in a proper case in equity, may enjoin a state officer from executing a state law in conflict with the Constitution of the United States, when such execution will violate the rights of the complainant; that, where the State is concerned, it should be made a party, if it can be done; but that the fact that it cannot be done is a sufficient reason for omitting to do it, and the case may proceed to decree against the State officers, in all respects as if the State were a party to the record. And, finally, that, in deciding who are parties to the suit, the court will not look beyond the record; and that, making a state officer a party does not make the State a party, though the State's statute may prompt the officer's action, and she may stand behind him as the real party in interest.

Although *Davis* v. *Gray* is a perfectly clear and express decision of this court, about the meaning of which there can be no doubt, it is not necessary in the present case to invoke

its authority to its full extent.   It not only decides all, but much more than all that is required in the present case.

*McComb* v. *Board of Liquidation*, 92 U. S. 531, is in every respect a leading case upon the present subject, the opinion being a very elaborate and careful one, the case being decided by an unanimous court, and the jurisdictional question being decided expressly upon the authority of *Osborn* v. *Bank* and *Davis* v. *Gray*.

The suit was for a perpetual injunction to restrain the Board of Liquidation of the State of Louisiana, from using certain bonds for the liquidation of a certain debt claimed to be due from the State to a private corporation, and from issuing any other state bonds in payment of such alleged debt.

This court distinctly considered the jurisdictional question involved, arising from the fact that the suit was against *state officers.*

*United States* v. *Lee*, 106 U. S. 196, was a suit in ejectment brought by Lee against Kaufman and Strong, to recover possession of what is known as the Arlington estate in Virginia. Kaufman and Strong holding merely as the agents and representatives of the United States, the land in question being in use as a national cemetery, for the most part, the United States, though not a party to the suit, defended the action by its proper law officers, though declining to submit itself as a defendant to the jurisdiction of the court.   The writs of error in this court were taken and prosecuted, one by the United States, *eo nomine*, the other by the Attorney General, in the names of Kaufman and Strong, the defendants below.   This court stated one of the two questions arising here on the record, as follows:

"1.  Could any action be maintained against the defendants for the possession of the land in controversy under the circumstances of the relation of that possession to the United States, however clear the legal right to that possession might be in the plaintiff ? "

At page 204, the court stated that the plaintiffs in error in behalf of the United States, asserted the proposition " that the court can render no judgment in favor of the plaintiff against

the defendants in the action, because the latter hold the property as officers and agents of the United States, and it is appropriated to lawful public uses;" and the court said, "This proposition rests on the principle that the United States cannot be lawfully sued without its consent, in any case, and that no action can be maintained against any individual without such consent, where the judgment must depend on the right of the United States to property held by such persons as officers or agents for the Government. The first branch of this proposition is conceded to be the established law of this country and of this court, at the present day; the second as a necessary or proper deduction from the first is denied."

The court then proceeded with an elaborate examination of American and English cases, and especially of the cases in this court which bear upon the general question, and cited especially and relied especially upon *Osborn* v. *The Bank of the United States* and *Davis* v. *Gray*. It then affirmed the judgment of the court below.

*Poindexter* v. *Greenhow*, 114 U. S. 270, was decided upon the authority especially of *Osborn* v. *Bank of the United States* and *United States* v. *Lee*. In that case an action of detinue was brought by a tax-payer, who had duly tendered tax-receivable coupons in payment of his taxes, against the person who, under color of office, as tax collector, acting under a void law, passed by the Legislature of the State, had refused to receive such tender, and had proceeded, by seizure and sale of the property of the plaintiff, to enforce the collection of such taxes; and it was held that such action was against the tax collector personally, as a wrong-doer, and not against the State, within the meaning of the 11th Amendment. And it was further held that such tax collector, when sued as a wrong-doer, cannot rest on the assertion of his defence as an officer of the State, but is bound to establish that he has acted under a valid authority, and must produce a valid law of the State which constitutes his warrant; thus following, almost in identical terms, the decision and language of this court in *Cunningham* v. *Macon & Brunswick Railroad Company*, 109 U. S. 446.

In *Allen* v. *Baltimore & Ohio Railroad Company*, 114 U. S. 311, Allen, the defendant below, was the Auditor of the State, the other defendants being the Treasurer of the State and the Treasurer of Augusta County, in Virginia. In that case an injunction was sought to prevent the collection of taxes, after a tender of payment in tax-receivable coupons; and it was held as sanctioned by repeated decisions of this court, and as common and unquestioned practice in similar cases, that the remedy by injunction was authorized. In this case, also, the court relied upon *Osborn* v. *Bank of the United States*, as well as upon *Board of Liquidation* v. *McComb*, and numerous other cases therein cited.

In *Ralston* v. *Missouri Fund Commissioners*, 120 U. S. 390, which was a suit brought by a private individual to restrain the Fund Commissioners from selling the Hannibal & St. Joseph Railroad, the distinction is clearly drawn between a suit to "compel a state officer to do what a statute has prohibited him from doing" and a suit "to get a state officer to do what a statute requires of him;" and it would seem to be a just conclusion from this distinction that, although the defendant is a state officer, if the suit is to compel him to do what a statute requires and, *a fortiori*, to restrain him from doing what a statute directs, when such statute is seen to be unconstitutional, there can be no objection to the suit on account of the official character of the defendant.

The cases which have now been examined seem to be sufficient to illustrate the line of cases which we have above described as asserting and enforcing somewhat broadly and fully the right of the courts to coerce or restrain state officers, in the interest of private parties who show themselves aggrieved by actual or threatened action of such state officers. But upon the general question, which we have said is all that is involved in the present proceedings, — whether a state officer may be enjoined from doing what an unconstitutional state statute directs him to do, — a multitude of other authorities in this court might be cited. See especially *Dodge* v. *Woolsey*, 18 How. 331; *Hawes* v. *Oakland*, 104 U. S. 450; *Huntington* v. *Palmer*, 104 U. S. 482; *Tomlinson* v. *Branch*,

15 Wall. 460; and *Transportation Co.* v. *Parkersburg*, 107 U. S. 691.

II. It was urged in the court below, and is now, against the jurisdiction of the Circuit Court in this case, that that court is prevented from issuing an injunction or restraining order, by the provision of § 720, Rev. Stat., which is in these words: "The writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a State, except in case where such injunction may be authorized by any law relating to proceedings in bankruptcy." This section has been in force since the act of May 2, 1793; and if it is applicable to the present case, it would deprive the Circuit Court of power to issue the restraining order in question. Our position in answer to this objection is, that it applies only to proceedings which are actually begun or pending in a state court at the time when the writ of injunction is applied for and issued. *Fisk* v. *Union Pacific Railway Co.*, 10 Blatchford, 578; *State Lottery Co.* v. *Fitzpatrick*, 3 Woods, 222; *Moore* v. *Holliday*, 4 Dillon, 52; *Live Stock, &c.*, v. *Crescent City, &c.*, 1 Abbott, U. S. 388; *Watson* v. *Bondurant*, 2 Woods, 166; *Haines* v. *Carpenter*, 91 U. S. 254; *Diggs* v. *Wolcott*, 4 Cranch, 179. Our conclusions from these authorities are that § 720 has no application to suits not actually depending in the state courts at the time of the issuing of the restraining order or injunction. In the present case, it is conceded that no suits had been begun at the time the restraining order was issued.

A somewhat metaphysical argument has been advanced, in answer to the view that the section applies only to suits actually depending, to the effect that the word "stay" in § 720 must be interpreted to cover all steps, acts, and means which may *result in staying* suits in state courts, including the prevention in any way or any case of the bringing of suits there. This plainly is too elastic and comprehensive. If to "stay" means here, to prevent in any sense, then almost any injunction or restraining order may be said to be forbidden by this section. "Proceedings in a state court" is a phrase needing no interpretation, commentary, or gloss. It means

and must mean, unless excessive refining is to be attributed to our early legislators (1793), proceedings which are *pending in* a state court, and not proceedings which may be contemplated or designed to be brought there.

In opposition to the cases now cited is the single case of *Rensselaer & Saratoga Railroad Co.* v. *Bennington, &c., Railroad Co.*, 18 Fed. Rep. 671. If the circumstances and facts of that case would make it an authority, in opposition to the cases which have been above cited, it may be said to stand alone, and to be the only authority which holds that the United States courts are prohibited by § 720 from restraining parties from bringing suits which have not already been begun in the state courts.

III. But it is said that the complainants in the present case do not show themselves to have such an interest in the subject matter of the suit as to give them a standing in the court below.

The substantial averments of the bill upon this point are: (1) That the complainants were the owners of $100,000 worth of tax-receivable coupons of Virginia, for which they had paid over $30,000; (2) That they have sold $50,000 of that amount for $15,000, or more, to tax-payers of Virginia, who have tendered the same to the proper state officials in payment of their taxes, and that said officers have refused to receive the same; (3) That if the officers of the State are permitted to enforce the act of May 12, 1887, the complainants will be unable to sell the remaining $50,000 of their coupons to the tax-payers of that State, at any price, and thus that their entire property in the same will be destroyed. It is unnecessary to do more than observe here that the averments of the bill must be taken as true, for the purposes of these proceedings, no answer to the bill having been filed.

The question arises, upon these averments, whether they are sufficient to give the complainants a standing in court. The only authorities which have been heretofore cited to show a want of sufficient interest in this suit are *Marye* v. *Parsons*, 114 U. S. 325, and *Hagood* v. *Southern*, 117 U. S. 52. Under these decisions it is urged that the complainants have no legal

ground of complaint, because they are not tax-payers and have never, as such, tendered any coupons; and that as to them the State had passed no law violating the obligation of her contract.

*Marye* v. *Parsons* presented these features: (1) That the relief sought was a mandatory injunction, which was intended to effect a specific performance of the contract to receive coupons in payment of taxes; (2) That the complainant, having no taxes to pay, could only avail himself of the benefit of the contract to receive the coupons in payment of taxes, by transferring them to a tax-payer; (3) That having transferred them, he would have extinguished his own interest in the coupons and would have deprived himself of any further right to insist upon the performance of the State's contract.

In the present case, however, it is seen that: (1) Unlike *Marye* v. *Parsons,* the only relief which the complainants seek is the preventive relief of an injunction to restrain state officers from destroying the value of the coupons; (2) The complainants in this case *have* transferred $50,000 of their coupons to tax-payers, who have tendered them, and they have been refused; and (3) That as to the remaining $50,-000, the execution of the act of May 12, 1887, as is alleged, will destroy entirely the value of these coupons. Manifestly, therefore, the case of *Marye* v. *Parsons* does not control the present case.

*Hagood* v. *Southern,* 117 U. S. 52, has already been stated in this argument. The only point in it, which bears upon the present question, is that the court there says of the complainant, that: "It cannot be said, as a matter of law, that the contract is broken until [the scrip] has been tendered for taxes due from a holder and been refused; nor that the legal right of the holder is threatened unless he is in a situation to make a present tender for that purpose. He has no legal right to have this scrip received for taxes, unless he owes taxes for which it is receivable; and in order that it may be used for the payment of the taxes of another, he must transfer it to the new holder, and that would divest himself of all right to enforce a contract to which he is no longer a party and in

which he has ceased to have a legal interest." How far, then, the case of *Hagood* v. *Southern* differs from the present case need not further be pointed out.

This brings us to an examination of the act of May 12, 1887, and it is evident that in every case of the tender of coupons heretofore or hereafter, the tax-payer is subjected to a suit for his taxes, notwithstanding such tender, and upon the trial of the suit he is compelled to file his coupons with the clerk; he is next required to produce the bond from which his coupon was cut and to prove that it was actually cut therefrom; he is next forbidden to introduce expert evidence of the genuineness of the coupons, though the coupons are engraved and not signed manually; and thereupon if he fails in his defence, as he inevitably must fail, the judgment of the court will be that he has failed to establish the genuineness of his coupons; and that hence, being spurious, they are not to be returned to him, but to remain in the custody of the clerk.

It is, therefore, as clear as a mathematical demonstration, that the effect of the act of May 12, 1887, *is to sequester, confiscate and destroy the coupons which may have been tendered heretofore or which may hereafter be tendered.*

Who shall say that this does not constitute such an interest on the part of these complainants as warrants them in coming into a court of equity for appropriate relief? Certainly, the cases of *Marye* v. *Parsons* and *Hagood* v. *Southern* do not, in the remotest degree, stand in their way.

IV. We assert the total and palpable unconstitutionality of the whole act of May 12, 1887, on account of the provisions of that act itself. That act, in its foreground, directs and requires the officers of the State to bring suits for the recovery of taxes from all tax-payers who have already tendered or who may hereafter tender, coupons of the tax-receivable bonds of Virginia, in payment of their taxes. This alone stamps the act as not only unconstitutional, but as a flagrant and open contempt of the solemn and repeatedly affirmed decision of this court in *Poindexter* v. *Greenhow*.

The decision and the effect of *Poindexter* v. *Greenhow* is that any act of the State of Virginia which directs any pro-

ceeding against a tax-payer, for the purpose of compelling him to pay the same taxes again, after a tender of coupons, is unconstitutional and void.

The act of May 12, 1887, is, upon this broad ground, which is completely covered by that decision, *totally and irredeem- ably unconstitutional.*

In closing, we desire to point out here, especially, that what is sought in our present case is not an *affirmative* remedy ; that is to say, we do not seek to compel the performance of any act whatever on the part of state officers. It does not fall, then, under this aspect, within the principle laid down in *Louisiana* v. *Jumel*, or in the separate concurring opinion of the four justices of this court in *Antoni* v. *Greenhow.* We are seeking to compel the performance of no acts ; but simply to restrain the officers of the State of Virginia from destroying the value of our coupons by enforcing the act of May 12, 1887.

*Mr. Royall* also filed a separate brief, opposing.

MR. JUSTICE MATTHEWS after stating the case, delivered the opinion of the court.

It is established by the decisions of this court, that while " the exercise of the power of punishment for contempt of their orders, by courts of general jurisdiction, is not subject to review by writ of error or appeal to this court," yet, when " a court of the United States undertakes, by its process of contempt, to punish a man for refusing to comply with an order which that court had no authority to make, the order itself, being without jurisdiction, is void, and the order punishing for the contempt is equally void ; " and that, " when the proceeding for contempt in such a case results in imprisonment, this court will, by its writ of *habeas corpus*, discharge the prisoner." *Ex parte Fisk*, 113 U. S. 713, 718.

In *Ex parte Rowland*, 104 U. S. 604, the commissioners of a county in Alabama were, on a writ of *habeas corpus*, discharged by this court from imprisonment to which they had been adjudged in consequence of an alleged contempt of the Circuit Court of the United States for the Middle District of

Alabama, in refusing to obey the command of a peremptory writ of *mandamus* issued by that court requiring them to levy certain taxes. This court said (page 612): "If the command of the peremptory writ of *mandamus* was in all respects such as the Circuit Court had jurisdiction to make, the proceedings for the contempt are not reviewable here. But if the command was in whole or in part beyond the power of the court, the writ, or so much as was in excess of jurisdiction, was void, and the court had no right in law to punish for any contempt of its unauthorized requirements. Such is the settled rule of decision in this court. *Ex parte Lange*, 18 Wall. 163; *Ex parte Parks*, 93 U. S. 18; *Ex parte Siebold*, 100 U. S. 371; *Ex parte Virginia*, 100 U. S. 339."

In *Ex parte Bain*, 121 U. S. 1, it was held that a prisoner who had been tried, convicted, and sentenced to imprisonment, by a Circuit Court of the United States, the indictment having been amended by the district attorney, by leave of the court, after it had been returned by the grand jury, was entitled to his discharge under a writ of *habeas corpus* issued by this court, on the ground that the proceeding was void. The court said (page 13): "It is of no avail, under such circumstances, to say that the court still has jurisdiction of the person and of the crime; for, though it has possession of the person, and would have jurisdiction of the crime, if it were properly presented by indictment, the jurisdiction of the offence is gone, and the court has no right to proceed any further in the progress of the case for want of an indictment."

The question in the present case, therefore, is whether the order of the Circuit Court of June 6, 1887, forbidding the petitioners from bringing suits under the act of May 12, 1887, in the name and on behalf of the State of Virginia, as its attorneys, for the recovery of taxes, in payment of which the tax-payers had previously tendered tax-receivable coupons, is an order which that court had power by law to make. The question really is whether the Circuit Court had jurisdiction to entertain the suit in which that order was made, because the sole purpose and prayer of the bill are, by a final decree, perpetually to enjoin the defendants from taking any steps in

execution of the act of May 12, 1887. If the court had power, upon the case made in the record, to entertain the suit for that purpose, it had equal power, as a provisional remedy, to grant the restraining order, the violation of which constitutes the contempt adjudged against the petitioners.

The principal contention on the part of the petitioners is that the suit, nominally against them, is, in fact and in law, a suit against the State of Virginia, whose officers they are, jurisdiction to entertain which is denied by the 11th Amendment to the Constitution, which declares that " the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign State." On the other hand, it is contended by counsel for the complainants in that cause, who have argued against the discharge of the petitioners, that the suit is not within that prohibition.

It must be regarded as a settled doctrine of this court, established by its recent decisions, " that the question whether a suit is within the prohibition of the 11th Amendment is not always determined by reference to the nominal parties on the record." *Poindexter* v. *Greenhow*, 114 U. S. 270, 287. This, it is true, is not in harmony with what was said by Chief Justice Marshall in *Osborn* v. *Bank of the United States*, 9 Wheat. 738, 857. In his opinion in that case he said : " It may, we think, be laid down as a rule which admits of no exception, that, in all cases where jurisdiction depends on the party, it is the party named in the record. Consequently, the 11th Amendment, which restrains the jurisdiction granted by the Constitution over suits against States, is, of necessity, limited to those suits in which a State is a party on the record. The amendment has its full effect, if the Constitution be construed as it would have been construed had the jurisdiction of the court never been extended to suits brought against a State by the citizens of another State or by aliens." And the point as involved in that case was stated by Mr. Justice Swayne, delivering the opinion of the court in *Davis* v. *Gray*, 16 Wall. 203, 220, as follows : " In deciding who are parties to the suit the

court will not look beyond the record. Making a state officer a party does not make the State a party, although her law may have prompted his action and the State may stand behind him as the real party in interest. A State can be made a party only by shaping the bill expressly with that view, as where individuals or corporations are intended to be put in that relation to the case." But what was said by Chief Justice Marshall in *Osborn v. Bank of the United States, supra,* must be taken in connection with its immediate context, wherein he adds (page 858): "The State not being a party on the record, and the court having jurisdiction over those who are parties on the record, the true question is not one of jurisdiction, but whether, in the exercise of its jurisdiction, the court ought to make a decree against the defendants; whether they are to be considered as having a real interest, or as being only nominal parties." This conveys the intimation, that where the defendants who are sued as officers of the State, have not a real, but merely a nominal interest in the controversy, the State appearing to be the real defendant, and therefore an indispensable party, if the jurisdiction does not fail for want of power over the parties, it does fail, as to the nominal defendants, for want of a suitable subject matter.

This, indeed, seems to be the interpretation put upon this language by Chief Justice Marshall himself in the opinion of the court, delivered by him in the case of *The Governor of Georgia v. Madrazo,* 1 Pet. 110, 123, 124. After quoting the paragraphs from the opinion in the case of *Osborn v. Bank of the United States,* above extracted, the Chief Justice mentioned the case of *Georgia v. Brailsford,* 2 Dall. 402, where the action was not in the name of the State, but was brought by the Governor in its behalf, and added: "If, therefore, the State was properly considered as a party in that case, it may be considered as a party in this." He further said: "The claim upon the Governor is as a governor; he is sued, not by his name, but by his title. The demand made upon him is not made personally, but officially. The decree is pronounced, not against the person, but the officer, and appears to have been pronounced against the successor of the original defendant;

as the appeal bond was executed by a different governor from him who filed the information. In such a case, where the chief magistrate of a State is sued, not by his name, but by his style of office, and the claim made upon him is entirely in his official character, we think the State itself may be considered as a party on the record. If the State is not a party, there is no party against whom a decree can be made. No person in his natural capacity is brought before the court as defendant." It was therefore held, in that case, that the State was in fact, though not in form, a party defendant to the suit, and that, consequently, the Circuit Court had no jurisdiction to pronounce the decree appealed from. See also *Ex parte Juan Madrazzo*, 7 Pet. 627. This view was reiterated by this court in *Kentucky* v. *Dennison*, 24 How. 66, 98, where it was said to be settled, "that where the State is a party, plaintiff or defendant, the Governor represents the State, and the suit may be, in form, a suit by him as Governor in behalf of the State, where the State is plaintiff, and he must be summoned or notified as the officer representing the State, where the State is defendant." Accordingly, in *Cunningham* v. *Macon & Brunswick Railroad Co.*, 109 U. S. 446, it was decided that in those cases where it is clearly seen upon the record that a State is an indispensable party to enable the court, according to the rules which govern its procedure, to grant the relief sought, it will refuse to take jurisdiction. The inference is, that where it is manifest, upon the face of the record, that the defendants have no individual interest in the controversy, and that the relief sought against them is only in their official capacity as representatives of the State, which alone is to be affected by the judgment or decree, the question then arising, whether the suit is not substantially a suit against the State, is one of jurisdiction.

The very question was presented in the cases of *New Hampshire* v. *Louisiana* and *New York* v. *Louisiana*, 108 U. S. 76. In each of those cases there was upon the face of the record nominally a controversy between two States, which, according to the terms of the Constitution, was subject to the judicial power of the United States. So far as could be determined

by reference to the parties named in the record, the suits were within the jurisdiction of this court; but, on an examination of the cases as stated in the pleadings, it appeared that the State, which was plaintiff, was suing, not for its own use and interest, but for the use and on behalf of certain individual citizens thereof, who had transferred their claims to the State for the purposes of suit. It was accordingly unanimously held by this court, that it would look behind and through the nominal parties on the record, to ascertain who were the real parties to the suit. The Chief Justice, speaking for the court in that case, made a review of the circumstances which led to the adoption of the 11th Amendment, and, in concluding his opinion, said: "The evident purpose of the amendment, so promptly proposed and finally adopted, was to prohibit all suits against a State by or for citizens of other States, or aliens, without the consent of the State to be sued; and, in our opinion, one State cannot create a controversy with another State, within the meaning of that term as used in the judicial clauses of the Constitution, by assuming the prosecution of debts owing by the other State to its citizens. Such being the case, we are satisfied that we are prohibited, both by the letter and the spirit of the Constitution, from entertaining these suits, and the bill in each case is dismissed." p. 91.

The converse of that case is to be found in *Hagood* v. *Southern*, 117 U. S. 52. There, the State of South Carolina, which was the party in interest, was not nominally a defendant. The nominal defendants were the Treasurer of the State of South Carolina, its Comptroller General, and the treasurers of its various counties and their successors in office. The object of the bills was to obtain on behalf of the complainants, by judicial process, the redemption by the State of certain scrip of which they were holders, according to the terms of a statute in pursuance of which it was issued, by the levy, collection, and appropriation of a special tax pledged to that purpose, as they claimed, by an irrepealable law, constituting a contract protected from violation by the Constitution of the United States. The decrees of the Circuit Court granting the relief were reversed, and the cause remanded, with

instructions to dismiss the bills, on the ground that the suits, though nominally against the officers of the State, were really against the State itself. In its opinion this court said (page 67): "These suits are accurately described as bills for the specific performance of a contract between the complainants and the State of South Carolina, who are the only parties to it. But to these bills the State is not in name made a party defendant, though leave is given to it to become such if it chooses; and, except with that consent, it could not be brought before the court and be made to appear and defend. And yet it is the actual party to the alleged contract, the performance of which is decreed; the one required to perform the decree; and the only party by whom it can be performed. Though not nominally a party to the record, it is the real and only party in interest, the nominal defendants being the officers and agents of the State, having no personal interest in the subject matter of the suit, and defending only as representing the State. And the things required by the decrees to be done and performed by them are the very things which, when done and performed, constitute a performance of the alleged contract by the State. The State is not only the real party to the controversy, but the real party against which relief is sought by the suit, and the suit is, therefore, substantially within the prohibition of the 11th Amendment to the Constitution of the United States."

The conclusions in the case of *Hagood* v. *Southern* were justified by what had previously been decided by this court in the cases of *Louisiana* v. *Jumel* and *Elliott* v. *Wiltz*, 107 U. S. 711. Those cases had for their object, one, by injunction, to restrain the officers of the State from executing the provisions of the act of the General Assembly alleged to be in violation of the contract rights of the plaintiffs, and the other, by mandamus, to require the appropriation of money from the treasury of the State in accordance with the contract. This relief, it was decided, was not within the competency of the judicial power. The Chief Justice said, on that point (page 727): "The remedy sought, in order to be complete, would require the court to assume all the executive authority

of the State, so far as it related to the enforcement of this law, and to supervise the conduct of all persons charged with any official duty in respect to the levy, collection, and disbursement of the tax in question until the bonds, principal and interest, were paid in full; and that, too, in a proceeding in which the State, as a State, was not and could not be made a party. It needs no argument to show that the political power cannot be thus ousted of its jurisdiction and the judiciary set in its place. When a State submits itself, without reservation, to the jurisdiction of a court in a particular case, that jurisdiction may be used to give full effect to what the State has, by its act of submission, allowed to be done; and if the law permits coercion of the public officers to enforce any judgment that may be rendered, then such coercion may be employed for that purpose. But this is very far from authorizing the courts, when a State cannot be sued, to set up its jurisdiction over the officers in charge of the public moneys, so as to control them as against the political power, in their administration of the finances of the State."

It is, therefore, not conclusive of the principal question in this case, that the State of Virginia is not named as a party defendant. Whether it is the actual party, in the sense of the prohibition of the Constitution, must be determined by a consideration of the nature of the case as presented on the whole record.

The substantial averments of the bill are, 1st, that the complainants were the owners of $100,000 worth of tax-receivable coupons of Virginia, for which they had paid over $30,000; 2d, that they have sold $50,000 of that amount for $15,000 or more to tax-payers of Virginia, who have tendered the same to the proper state officials in payment of their taxes, but that said officers have refused to receive the same; 3d, that if the officers of the State are permitted to enforce the act of May 12, 1887, the complainants will be unable to sell the remaining $50,000 of their coupons to the tax-payers of that State at any price, and thus their entire property in the same will be destroyed; 4th, that the act of May 12, 1887, is unconstitutional and void, because it impairs the obligation of the contract of

the State of Virginia by which it agreed to receive coupons cut from its bonds in payment of debts, demands, and taxes due to it.

The particulars in which this contract is alleged to be violated by the provisions of that act are, first, that, in disregard of tenders of tax-receivable coupons made by tax-payers in payment of taxes, the act of the General Assembly peremptorily requires actions at law to be brought in the name of the State of Virginia against all such tax-payers as delinquent; second, because in the trial of such actions it is required that the defendant shall not only prove the fact of tender, but the genuineness of the coupons tendered; third, that as part of that proof he is required to produce the bond itself from which such coupon is said to have been cut; and, fourth, that he is not permitted to introduce expert testimony to prove the genuineness of the coupons tendered. The prayer of the bill is, that the Attorney General of the State of Virginia, and the Commonwealth's attorneys for the counties, be restrained by injunction from commencing and prosecuting any suits under the act of May 12, 1887, for the recovery of taxes against parties alleged to be delinquent, but who in fact have tendered tax-receivable coupons in payment of taxes due.

It is to be noted that there is no direct averment in the original or amended bills that the coupons alleged to have been tendered in payment of taxes by those tax-payers against whom the defendants threatened to bring suits under the act of May 12, 1887, were purchased from the complainants, although it incidentally appears otherwise upon the record that some of them may have been. The injunction, however, prayed for is to prevent the bringing of any suits under that act against tax-payers who have tendered coupons, whether the coupons were purchased from the complainants or not.

It is also to be observed that the only personal act on the part of the petitioners sought to be restrained by the original order of June 6, 1887, in pursuance of the prayer of the bill, is the bringing of any suit under the act of May 12, 1887, against any person who had tendered tax-receivable coupons in payment of taxes due to the State of Virginia. Any such suit,

must, by the statute, be brought in the name of the State, and for its use.

It is immaterial, in our opinion, to consider the matters which are alleged in respect to the course and conduct of such a suit after its institution, by reason of the provisions contained in other acts of the General Assembly of the State restricting the mode of proof of the genuineness of the coupons tendered. What is required by the act of May 12, 1887, is that, "If the defendant relies on a tender of coupons as payment of the taxes claimed, he shall plead the same specifically and in writing, and file with the plea the coupons averred therein to have been tendered, and the clerk shall carefully preserve them. Upon such plea filed the burden of proving the tender and the genuineness of the coupons shall be on the defendant. If the tender and the genuineness of the coupons be established, judgment shall be for the defendant on the plea of tender. In such case the clerk shall write the word ' proved,' and thereunder his name in his official character, across the face of the coupons, and transmit them, together with a certificate of the court that they have been proven in the case, to the auditor of public accounts, who shall deliver the coupons to the second auditor, receiving therefor the check of the second auditor upon the treasurer, which check he shall pay into the treasury to the credit of the proper tax account."

If a suit may be rightfully brought at all by the State to recover a judgment for taxes, in such a case, certainly, there is nothing in these provisions that violates any legal or contract right of the party sued. If he defends the action on the ground of a lawful tender of payment, he must, of course, plead the tender, and may rightfully be required to bring into court the tender alleged to have been made. Under the issue upon this plea the burden is upon the defendant of proving the truth of its allegations. What shall be the amount and kind of proof necessary to establish the defence involves questions of law which can only be raised and decided in the course of the trial. Their determination is for the court where the trial is to be had. If, in pursuance of other acts of the General Assembly, the contract rights of the defendant, as a tax-payer having

tendered tax-receivable coupons, are denied to him in that trial, by reason of requirements in regard to the nature and quantity of proof as to the genuineness of the coupons, the errors of law thus committed can only be remedied, according to the common course of judicial proceedings, by a writ of error, which, as it would present a Federal question, might ultimately be sued out in this court. But it is not to be assumed in advance, either, that such questions will arise, or that, if they arise, they will be erroneously decided. The question, therefore, is narrowed to the single inquiry of the equitable right of the complainants to enjoin the petitioners against bringing any such suits at all.

It seems to be supposed in argument, that the right of taxpayers in Virginia, who have tendered tax-receivable coupons in payment of their taxes to the proper collecting officer, to be forever thereafter free from suit by the State to recover judgment for such taxes, rests upon the proposition that such a tender is in law a payment of the taxes, so as to extinguish all claim for them on the part of the State. This proposition, indeed, is said to be justified by the authority of certain language in the opinion of this court in the case of *Poindexter* v. *Greenhow*, 114 U. S. 270. In that case the effect of a tender in payment of taxes upon the subsequent act of the collector in seizing the personal property of the tax-payer was considered and decided, but there is nothing in the opinion which countenances the idea that such a tender was a payment of the taxes, so as to extinguish all subsequent claim of the State therefor. Its effect was precisely defined in the following statement (page 299): " His tender, as we have already seen, was equivalent to payment, *so far as concerns the legality of all subsequent steps by the collector to enforce payment by distraint of his property.*" There is nothing in the opinion to indicate that the party making the tender was relieved from the operation of the rule of law, making it necessary to keep the tender good, or that a subsequent action at law for the recovery of the taxes would be unlawful, reserving, of course, in such a case, the admitted right of the defendant to plead the fact of his tender and bring it into court, in pursuance of the usual practice in such cases, as a defence.

It follows, therefore, in the present case, that the personal act of the petitioners sought to be restrained by the order of the Circuit Court, reduced to the mere bringing of an action in the name of and for the State against tax-payers, who, although they may have tendered tax-receivable coupons, are charged as delinquents, cannot be alleged against them as an individual act in violation of any legal or contract rights of such tax-payers.

Much more difficult is it to conceive that it constitutes a grievance of which the complainants in the principal suit have any legal right to complain. No suits against the complainants themselves are apprehended, and their pecuniary interest in the actions threatened against tax-payers, who have made tenders of tax-receivable coupons purchased from them, with their guaranty against loss in consequence thereof, is collateral and remote. The bringing of such actions is no breach of any contract subsisting between the complainants and the State of Virginia. All rights under the contract contained in the coupons they parted with when they transferred them to tax-payers. If the complainants have agreed in that transfer that they shall be received by the State in payment of taxes, that is a contract between the complainants and the tax-payer, their assignee, to which the State is not a party. It is one the complainants have voluntarily entered into, and for which the State cannot be held responsible.

In that aspect, the case does not differ in principle from *Marye* v. *Parsons*, 114 U. S. 325. The consequential losses in the diminution of the market value of the coupons which they still hold, and the liability of the complainants to make good their warranty to tax-payers to whom they have transferred the others, are not direct and legal consequences of any breach of the contract made with the State of Virginia, by which the coupons are made receivable in payment of taxes. As such damage could not be recovered in a direct action upon the contract, if the State were suable at law, so neither can it be made the foundation of any preventive relief by injunction.

These considerations, however, are adverted to in this con-

nection, not so much for the purpose of showing that the substance of the bill presents a case the subject matter of which is not within the jurisdiction of the court, as to show that it does not allege any grounds of equitable relief against the individual defendants for any personal wrong committed or threatened by them. It does not charge against them in their individual character anything done or threatened which constitutes, in contemplation of law, a violation of personal or property rights, or a breach of contract to which they are parties.

The relief sought is against the defendants, not in their individual, but in their representative capacity as officers of the State of Virginia. The acts sought to be restrained are the bringing of suits by the State of Virginia in its own name and for its own use. If the State had been made a defendant to this bill by name, charged according to the allegations it now contains — supposing that such a suit could be maintained — it would have been subjected to the jurisdiction of the court by process served upon its Governor and Attorney General, according to the precedents in such cases. *New Jersey* v. *New York*, 5 Pet. 284, 288, 290; *Kentucky* v. *Dennison*, 24 How. 66, 96, 97; Rule 5 of 1884, 108 U. S. 574. If a decree could have been rendered enjoining the State from bringing suits against its tax-payers, it would have operated upon the State only through the officers who by law were required to represent it in bringing such suits, viz., the present defendants, its Attorney General, and the Commonwealth's attorneys for the several counties. For a breach of such an injunction, these officers would be amenable to the court as proceeding in contempt of its authority, and would be liable to punishment therefor by attachment and imprisonment.

The nature of the case, as supposed, is identical with that of the case as actually presented in the bill, with the single exception that the State is not named as a defendant. How else can the State be forbidden by judicial process to bring actions in its name, except by constraining the conduct of its officers, its attorneys, and its agents? And if all such officers, attorneys, and agents are personally subjected to the process of the

court, so as to forbid their acting in its behalf, how can it be said that the State itself is not subjected to the jurisdiction of the court as an actual and real defendant?

It is, however, insisted upon in argument that it is within the jurisdiction of the Circuit Court of the United States to restrain by injunction officers of the States from executing the provisions of state statutes, void by reason of repugnancy to the Constitution of the United States; that there are many precedents in which that jurisdiction has been exercised under the sanction of this court; and that the present case is covered by their authority.

The principal authority relied upon to maintain this proposition is the judgment of this court in the case of *Osborn* v. *Bank of the United States*, 9 Wheat. 738. As strengthening the argument based upon that decision, our attention is called by counsel to a feature of the case which it is said does not clearly appear from the official report by Mr. Wheaton. The original record of the case shows that the bill, after setting out the substance of the act of the Legislature of Ohio complained of, alleged that Osborn, the Auditor of the State, and the officer upon whom the execution of the statute of the State was enjoined, "daily gives it out in speeches that he will execute and enforce the provisions of the said act of Ohio against your orators." And it is part of the prayer of the bill "to stay and enjoin said Ralph Osborn, auditor as aforesaid, and all others whom it may concern in anywise, from proceeding against your orators under and in virtue of the act of Ohio aforesaid, or any section, part, or provision thereof." It also appears that it was part of the decree of the Circuit Court, from which the appeal was prosecuted, "that the defendants and each of them be perpetually enjoined from proceeding to collect any tax, which has accrued or may hereafter accrue, from the complainants under the act of the General Assembly of Ohio in the bill and proceedings mentioned." But the act of the Legislature of Ohio, declared to be unconstitutional and void in that case, had for its sole purpose the levy and collection of an annual tax of $50,000 upon each office of discount and deposit of the Bank of the United States within that State, to

be collected, in case of refusal to pay, by the Auditor of State by a levy upon the money, bank notes, or other goods and chattels, the property of the bank, to seize which it was made lawful, under the warrant of the auditor, for the person to whom it was directed, to enter the bank for the purpose of finding and seizing property to satisfy the same. The wrong complained of and sought to be prevented by the injunction prayed for was this threatened seizure of the property of the bank. An actual seizure thereof, in violation of the injunction, was treated as a contempt of the court, for which the parties were attached, and the final decree of the Circuit Court restored the property taken to the possession of the complainant. In disposing of the case in this court, the opinion of Chief Justice Marshall concludes as follows, 9 Wheat. 871: "We think then that there is no error in the decree of the Circuit Court for the District of Ohio, so far as it directs restitution of the specific sum of $98,000, which was taken out of the bank unlawfully and was in the possession of the defendant Samuel Sullivan when the injunction was awarded in September, 1820, to restrain him from paying it away, or in any manner using it, and so far as it directs the payment of the remaining sum of $2000 by the defendants Ralph Osborn and John L. Harper; but that the same is erroneous so far as respects the interest on the coin, part of the said $98,000, it being the opinion of this court that while the parties were restrained by the authority of the Circuit Court from using it they ought not to be charged with interest. The decree of the Circuit Court for the District of Ohio is affirmed as to the said sums of $98,000 and $2000, and reversed as to the residue."

The mandate from this court was in accordance with the terms of this judgment.

There is nothing, therefore, in the judgment in that cause, as finally defined, which extends its authority beyond the prevention and restraint of the specific act done in pursuance of the unconstitutional statute of Ohio, and in violation of the act of Congress chartering the bank, which consisted of the unlawful seizure and detention of its property. It was conceded throughout that case, in the argument at the bar and in the

opinion of the court, that an action at law would lie, either of trespass or detinue, against the defendants as individual trespassers guilty of a wrong in taking the property of the complainant illegally, vainly seeking to defend themselves under the authority of a void act of the General Assembly of Ohio. One of the principal questions in the case was whether equity had jurisdiction to restrain the commission of such a mere trespass, a jurisdiction which was upheld upon the circumstances and nature of the case, and which has been repeatedly exercised since. But the very ground on which it was adjudged not to be a suit against the State, and not to be one in which the State was a necessary party, was that the defendants personally and individually were wrongdoers, against whom the complainants had a clear right of action for the recovery of the property taken, or its value, and that therefore it was a case in which no other parties were necessary. The right asserted and the relief asked were against the defendants as individuals. They sought to protect themselves against personal liability by their official character as representatives of the State. This they were not permitted to do, because the authority under which they professed to act was void.

In pursuance of the principles adjudged in the case of *Osborn* v. *Bank of the United States, supra,* it has been repeatedly and uniformly held by this court that an injunction will lie to restrain the collection of taxes sought to be collected by seizures of property imposed in the name of the State, but contrary to the Constitution of the United States, the defendants being officers of the State threatening the distraint complained of. The grounds of this jurisdiction were stated in *Allen* v. *Baltimore & Ohio Railroad Co.,* 114 U. S. 311. The vital principle in all such cases is that the defendants, though professing to act as officers of the State, are threatening a violation of the personal or property rights of the complainant, for which they are personally and individually liable. This principle was plainly stated in the opinion of the court in *Poindexter* v. *Greenhow,* 114 U. S. 270, as follows (page 282): "The case then of the plaintiff below is reduced to this: He had paid the tax demanded of him by a

lawful tender. The defendant had no authority of law thereafter to attempt to enforce other payment by seizing his property. In doing so he ceased to be an officer of the law, and became a private wrongdoer. It is the simple case in which the defendant, a natural private person, has unlawfully with force and arms seized, taken, and detained the personal property of another." It was also stated (page 288): "The *ratio decidendi* in this class of cases is very plain. A defendant sued as a wrongdoer, who seeks to substitute the State in his place, or to justify by the authority of the State, or to defend on the ground that the State has adopted his act and exonerated him, cannot rest on the bare assertion of his defence. He is bound to establish it. The State is a political corporate body, can act only through agents, and can command only by laws. It is necessary, therefore, for such a defendant, in order to complete his defence, to produce a law of the State which constitutes his commission as its agent, and a warrant for his act. This the defendant in the present case undertook to do." The legislation under which the defendant justified being declared to be null and void as contrary to the Constitution of the United States, therefore left him defenceless, subject to answer to the consequences of his personal act in the seizure and detention of the plaintiff's property, and responsible for the damages occasioned thereby.

This principle is illustrated and enforced by the case of *United States* v. *Lee*, 106 U. S. 196. In that case the plaintiffs had been wrongfully dispossessed of their real estate by defendants, claiming to act under the authority of the United States. That authority could exist only as it was conferred by law, and as they were unable to show any lawful authority under the United States, it was held that there was nothing to prevent the judgment of the court against them as individuals, for their individual wrong and trespass. This feature will be found, on an examination, to characterize every case where persons have been made defendants for acts done or threatened by them as officers of the government, either of a State or of the United States, where the objection has been interposed that the State was the real defendant, and has been

overruled. The action has been sustained only in those instances where the act complained of, considered apart from the official authority alleged as its justification, and as the personal act of the individual defendant, constituted a violation of right for which the plaintiff was entitled to a remedy at law or in equity against the wrongdoer in his individual character.

The present case stands upon a footing altogether different. Admitting all that is claimed on the part of the complainants as to the breach of its contract on the part of the State of Virginia by the acts of its General Assembly referred to in the bill of complaint, there is nevertheless no foundation in law for the relief asked. For a breach of its contract by the State, it is conceded there is no remedy by suit against the State itself. This results from the 11th Amendment to the Constitution, which secures to the State immunity from suit by individual citizens of other States or aliens. This immunity includes not only direct actions for damages for the breach of the contract brought against the State by name, but all other actions and suits against it, whether at law or in equity. A bill in equity for the specific performance of the contract against the State by name, it is admitted could not be brought. In *Hagood* v. *Southern*, 117 U. S. 52, it was decided that in such a bill, where the State was not nominally a party to the record, brought against its officers and agents, having no personal interest in the subject matter of the suit, and defending only as representing the State, where "the things required by the decree to be done and performed by them are the very things which, when done and performed, constitute a performance of the alleged contract by the State," the court was without jurisdiction, because it was a suit against a State.

The converse of that proposition must be equally true, because it is contained in it; that is, a bill, the object of which is by injunction, indirectly, to compel the specific performance of the contract, by forbidding all those acts and doings which constitute breaches of the contract, must also, necessarily, be a suit against the State. In such a case, though the State be

not nominally a party on the record, if the defendants are its officers and agents, through whom alone it can act in doing and refusing to do the things which constitute a breach of its contract, the suit is still, in substance, though not in form, a suit against the State. Such is the precise character of the suit in the Circuit Court against the petitioners in which the order was made, the violation of which constitutes the contempt for which they have been committed to the imprisonment from which they seek delivery by these writs.

It may be asked what is the true ground of distinction, so far as the protection of the Constitution of the United States is invoked, between the contract rights of the complainant in such a suit, and other rights of person and of property. In these latter cases it is said that jurisdiction may be exercised against individual defendants, notwithstanding the official character of their acts, while in cases of the former description the jurisdiction is denied.

The distinction, however, is obvious. The acts alleged in the bill as threatened by the defendants, the present petitioners, are violations of the assumed contract between the State of Virginia and the complainants, only as they are considered to be the acts of the State of Virginia. The defendants, as individuals, not being parties to that contract, are not capable in law of committing a breach of it. There is no remedy for a breach of a contract, actual or apprehended, except upon the contract itself, and between those who are by law parties to it. In a certain sense and in certain ways the Constitution of the United States protects contracts against laws of a State subsequently passed impairing their obligation, and this provision is recognized as extending to contracts between an individual and a State; but this, as is apparent, is subject to the other constitutional principle, of equal authority, contained in the 11th Amendment, which secures to the State an immunity from suit. Wherever the question arises in a litigation between individuals, which does not involve a suit against a State, the contract will be judicially recognized as of binding force, notwithstanding any subsequent law of the State impairing its obligation. But this right is incidental to

the judicial proceeding in the course of which the question concerning it arises. It is not a positive and substantive right of an absolute character, secured by the Constitution of the United States against every possible infraction, or for which redress is given as against strangers to the contract itself, for the injurious consequences of acts done or omitted by them. Accordingly, it was held in *Carter* v. *Greenhow*, 114 U. S. 317, that no direct action for the denial of the right secured by a contract, other than upon the contract itself, would lie under any provisions of the statutes of the United States authorizing actions to redress the deprivation, under color of state law, of any right, privilege, or immunity secured by the Constitution of the United States. In that case it was said (page 322): "How, and in what sense, are these rights secured to him by the Constitution of the United States? The answer is, by the provision of Article I, § 10, which forbids any State to pass laws impairing the obligation of contracts. That constitutional provision, so far as it can be said to confer upon or secure to any person any individual rights, does so only indirectly and incidentally. It forbids the passage by the States of laws such as are described. If any such are, nevertheless, passed by the legislature of a State, they are unconstitutional and void. In any judicial proceeding necessary to vindicate his rights under a contract affected by such legislation, the individual has a right to have a judicial determination declaring the nullity of the attempt to impair its obligation. This is the only right secured to him by that clause of the Constitution." But where the contract is between the individual and the State, no action will lie against the State, and any action founded upon it against defendants who are officers of the State, the object of which is to enforce its specific performance by compelling those things to be done by the defendants which, when done, would constitute a performance by the State, or to forbid the doing of those things which, if done, would be merely breaches of the contract by the State, is in substance a suit against the State itself, and equally within the prohibition of the Constitution.

It cannot be doubted that the 11th Amendment to the Con-

stitution operates to create an important distinction between contracts of a State with individuals and contracts between individual parties. In the case of contracts between individuals, the remedies for their enforcement or breach, in existence at the time they were entered into, are a part of the agreement itself, and constitute a substantial part of its obligation. *Louisiana* v. *New Orleans*, 102 U. S. 203. That obligation, by virtue of the provision of Article I, § 10, of the Constitution of the United States, cannot be impaired by any subsequent state legislation. Thus, not only the covenants and conditions of the contract are preserved, but also the substance of the original remedies for its enforcement. It is different with contracts between individuals and a State. In respect to these, by virtue of the 11th Amendment to the Constitution, there being no remedy by a suit against the State, the contract is substantially without sanction, except that which arises out of the honor and good faith of the State itself, and these are not subject to coercion. Although the State may, at the inception of the contract, have consented as one of its conditions to subject itself to suit, it may subsequently withdraw that consent and resume its original immunity, without any violation of the obligation of its contract in the constitutional sense. *Beers* v. *Arkansas*, 20 How. 527; *Railroad Co.* v. *Tennessee*, 101 U. S. 337. The very object and purpose of the 11th Amendment were to prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties. It was thought to be neither becoming nor convenient that the several States of the Union, invested with that large residuum of sovereignty which had not been delegated to the United States, should be summoned as defendants to answer the complaints of private persons, whether citizens of other States or aliens, or that the course of their public policy and the administration of their public affairs should be subject to and controlled by the mandates of judicial tribunals without their consent, and in favor of individual interests. To secure the manifest purposes of the constitutional exemption guaranteed by the 11th Amendment requires that it should be interpreted,

not literally and too narrowly, but fairly, and with such breadth and largeness as effectually to accomplish the substance of its purpose.  In this spirit it must be held to cover, not only suits brought against a State by name, but those also against its officers, agents, and representatives, where the State, though not named as such, is, nevertheless, the only real party against which alone in fact the relief is asked, and against which the judgment or decree effectively operates.

But this is not intended in any way to impinge upon the principle which justifies suits against individual. defendants, who, under color of the authority of unconstitutional legislation by the State, are guilty of personal trespasses and wrongs, nor to forbid suits against officers in their official capacity either to arrest or direct their official action by injunction or mandamus, where such suits are authorized by law, and the act to be done or omitted is purely ministerial, in the performance or omission of which the plaintiff has a legal interest. In respect to the latter class of cases, we repeat what was said by this court in *Board of Liquidation* v. *McComb*, 92 U. S. 531, 541 : " A State, without its consent, cannot be sued by an individual; and a court cannot substitute its own discretion for that of executive officers in matters belonging to the proper jurisdiction of the latter.  But it has been well settled, that, when a plain official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a mandamus to compel its performance; and when such duty is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which adequate compensation cannot be had at law, may have an injunction to prevent it.  In such cases, the writs of mandamus and injunction are somewhat correlative to each other. In either case, if the officer plead the authority of an unconstitutional law for the non-performance or violation of his duty, it will not prevent the issuing of the writ.  An unconstitutional law will be treated by the courts as null and void." An example and illustration of this class will be found in *Seibert* v. *Lewis*, 122 U. S. 284.

Nor need it be apprehended that the construction of the 11th Amendment, applied in this case, will in anywise embarrass or obstruct the execution of the laws of the United States, in cases where officers of a State are guilty of acting in violation of them under color of its authority. The government of the United States, in the enforcement of its laws, deals with all persons within its territorial jurisdiction, as individuals owing obedience to its authority. The penalties of disobedience may be visited upon them, without regard to the character in which they assume to act, or the nature of the exemption they may plead in justification. Nothing can be interposed between the individual and the obligation he owes to the Constitution and laws of the United States, which can shield or defend him from their just authority, and the extent and limits of that authority the government of the United States, by means of its judicial power, interprets and applies for itself. If, therefore, an individual, acting under the assumed authority of a State, as one of its officers, and under color of its laws, comes into conflict with the superior authority of a valid law of the United States, he is stripped of his representative character, and subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States.

In contradistinction to these classes of cases, for the reasons given, we adjudge the suit of *Cooper and Others* v. *Marye and Others*, in which the injunctions were granted against the present petitioners, to be in substance and in law a suit against the State of Virginia. . It is, therefore, within the prohibition of the 11th Amendment to the Constitution. By the terms of that provision, it is a case to which the judicial power of the United States does not extend. The Circuit Court was without jurisdiction to entertain it. All the proceedings in the exercise of the jurisdiction which it assumed are null and void. . The orders forbidding the petitioners to bring the suits, for bringing which they were adjudged in contempt of its authority, it had no power to make. The orders adjudging

them in contempt were equally void, and their imprisonment is without authority of law.    It is therefore

*Ordered that the petitioners be discharged.*

MR. JUSTICE FIELD concurring.

I concur in the judgment discharging from arrest and imprisonment the Attorney General of Virginia, and other officers of the State, who were adjudged by the Circuit Court to be guilty of contempt in refusing to obey the order of that court in the case of *Cooper* v. *Marye,* and were fined, and committed until the fine should be paid, and they should purge themselves of their contempt by doing the acts commanded. I also concur in the main position stated in the opinion of the court, upon which the discharge of the petitioners is ordered; namely: that the case of *Cooper* v. *Marye* was in law and fact a suit by subjects of a foreign state against the State of Virginia.    To a suit of that character the judicial power of the United States cannot, by the Eleventh Amendment of the Constitution, be extended.    The object of that suit was to enjoin the Attorney General and the Commonwealth's attorneys of the several counties, cities, and towns of Virginia from bringing any suits in the name of the Commonwealth to enforce the collection of taxes, for the payment of which coupons originally attached to her bonds had been tendered.    To enjoin the officers of the Commonwealth, charged with the supervision and management of legal proceedings in her behalf, from bringing suits in her name, is nothing less than to enjoin the Commonwealth, for only by her officers can such suits be instituted and prosecuted.    This seems to me an obvious conclusion.

The reason given in the bill in *Cooper* v. *Marye,* for seeking the injunction, is that the State has passed various acts creating impediments in the way of holders of coupons establishing their genuineness, by which their value will be practically destroyed, and the performance of these obligations be evaded, unless the officers of the State are restrained from prosecuting such suits.    The numerous devices to which the State has resorted in order to escape from her obligations under the

forms of law may, it is true, seriously embarrass the coupon holder in the assertion of his claims; but that is not a sufficient reason for denying to the State the right to prosecute her demands for taxes in her own courts. If the obstacles to the maintenance of the claims of the coupon holder, presented by the State legislation, are repugnant to the Constitution and laws of the United States, we cannot assume in advance that they will be sustained by the courts of Virginia when the coupons tendered are produced in the suits mentioned, and for that reason deny to her a hearing there upon her own demands. If they should be sustained, a remedy may be found in this tribunal, where decisions in conflict with the Constitution and laws of the United States may be reviewed and corrected.

There are many cases — indeed, they are of frequent occurrence — where officers of the State, acting under legislation in conflict with the Constitution and laws of the United States — may be restrained by the Federal courts, as where those officers attempt, by virtue of such legislation, to take private property for public use without offering compensation, or in other ways to deprive one of the use and enjoyment of his property. I do not understand that the opinion of the court is against this doctrine; but, on the contrary, that it is recognized and approved. There is a wide difference between restraining officers of the State from interfering in such cases with the property of the citizen, and restraining them from prosecuting a suit in the name of the State in her own courts to collect an alleged claim. Her courts are at all times as open to her for the prosecution of her demands as they are open to her citizens for the prosecution of their claims.

I, however, make this special concurrence in the opinion of the majority because of language in it expressing approval of the positions taken by the court in *Louisiana* v. *Jumel*, from which I dissented — not agreeing with the majority either in the statement of the object of that case, or in the law applicable to it. 107 U. S. 728. I considered that case as brought to compel the officers of the State to do what she had by her laws and former constitution consented they might

by the judicial tribunals be required to do.  I expressed, at
the time, against the majority of the court, my conviction of
the invalidity and unconstitutionality of the ordinance of repu-
diation embodied in the new constitution of Louisiana.  At
the same time I also expressed in *Antoni* v. *Greenhow* my
opinion of the equally invalid legislation of Virginia.  107
U. S. 784.  I adhere to my dissenting opinions in those cases,
and in concurring in the judgment in this case I do not in any
respect depart from or qualify what I there said.

MR. JUSTICE HARLAN dissenting.

As I adhere to the views expressed by me in *Louisiana* v.
*Jumel*, 107 U. S. 746 ; *Antoni* v. *Greenhow*, 107 U. S. 801 ;
and *Cunningham* v. *Macon & Brunswick Railroad Company*,
109 U. S. 458 ; and as I concurred in the judgments in *Poin-
dexter* v. *Greenhow*, 114 U. S. 273, and *Allen* v. *Baltimore &
Ohio Railroad Company*, 114 U. S. 311, I feel obliged to dis-
sent from the opinion and judgment in these cases.

In *Cooper* v. *Marye*, &c., the jurisdiction of the Circuit
Court cannot be questioned, so far as it depends upon the
citizenship of the parties ; for the plaintiffs are subjects or
citizens of Great Britain, and the defendants are citizens of
Virginia.

Whether the plaintiffs merely as holders of Virginia cou-
pons, and not tax-payers in that Commonwealth, have any
legal ground of complaint, by reason of the refusal of her
officers to accept, when tendered, like coupons which the
plaintiffs sold or transferred to tax-payers to be used in meet-
ing their taxes ; whether the statutes under which those offi-
cers proceeded, or intend to proceed, are repugnant to the
Constitution of the United States, and, therefore, void ;
whether the preliminary injunction in question should or
should not have been refused upon the ground that such
tax-payers have a complete and adequate remedy at law ;
whether the necessity of avoiding conflicts between the courts
of the United States and the officers of a State, acting in
obedience to her statutes, was not ample reason for refusing

to grant such injunction; or whether an officer ought to be enjoined from merely bringing a suit in behalf of the public— the suit itself not necessarily, or before judgment therein, involving an invasion of the property rights of the defendant therein—are all matters which the Circuit Court, sitting in equity, was competent to determine upon the final hearing in *Cooper* v. *Marye, &c.* Those questions are not open for consideration here except upon the appeal from the final decree in that case; consequently, I am not at liberty now to express an opinion as to any of them.

The only inquiry now to be made is, whether *Cooper* v. *Marye* is a suit against Virginia within the meaning of the 11th Amendment to the Constitution of the United States. If it be, I agree that the prisoners must be discharged; for the judicial power of the United States does not extend to suits against a State by citizens of another State, or by subjects of foreign countries.

But I am of opinion that it is not a suit of that character. I stand upon what was adjudged in *Osborn* v. *United States Bank*, 9 Wheat. at page 857. Chief Justice Marshall, speaking for the court in that case, said: "It may, we think, be laid down as a rule *which admits of no exception*, that in all cases where jurisdiction depends on the party, it is the party *named in the record.* Consequently, the 11th Amendment, which restrains the jurisdiction granted by the Constitution over suits against States, is, of necessity, limited to those suits in which a State is a party on the record. The amendment has its full effect, if the Constitution be construed as it would have been construed, had the jurisdiction of the court never been extended to suits brought against a State by the citizens of another State, or by aliens. The State not being a party on the record, and the court having jurisdiction over those who are parties on the record, the true question is, not one of jurisdiction, but whether, *in the exercise* of its jurisdiction, the court *ought* to make a decree against the defendants; whether they are to be considered as having a real interest, or as being only nominal parties."

These principles have been recognized in several decisions of

this court, notably in *United States* v. *Lee* and *Kaufman* v. *Lee*, 106 U. S. 196, 213, 215. That was an action to recover a body of land in Alexandria County, Virginia, two hundred acres of which constituted Arlington Cemetery, previously established by the United States as a military station and as a national cemetery for the soldiers and sailors of the Union. When the action was brought that cemetery was in the actual possession of the United States by the defendants, *as their officers*. Those officers certainly had no personal interest in the result of the suit. They simply represented the United States, who were the real parties in interest. As the United States were not parties to the record, and because they could not be made parties, the court proceeded to a determination of the case between the parties before it. The result was a judgment, determining that Lee had a legal right to the possession of Arlington Cemetery as against the officers of the United States having it under their control. The authority and duty of the court to proceed in the case, notwithstanding the United States were not before the court, was rested mainly upon the decision in *Osborn* v. *Bank of the United States*, from which was quoted, with emphatic approval, the following language: "If the State of Ohio could have been made a party defendant, it can scarcely be denied that this would be a strong case for an injunction. The objection is that, as the real party cannot be brought before the court, a suit cannot be sustained against the agents of that party; and cases have been cited to show that a court of chancery will not make a decree unless all those who are substantially interested be made parties to the suit. This is certainly true where it is in the power of the plaintiff to make them parties; but if the person who is the real principal, the person who is the true source of the mischief, by whose power and for whose advantage it is done, be himself above the law, be exempt from all judicial process, it would be subversive of the best established principles to say that the laws could not afford the same remedies against the agent employed in doing the wrong which they would afford against him could his principal be joined in the suit." And in order that no one might suppose that *Osborn* v. *Bank of the United*

*States* had been modified or overruled by subsequent decisions, the court in the Lee case, after referring to several decisions, said: "These decisions have never been overruled. On the contrary, as late as the case of *Davis* v. *Gray*, 16 Wall. 203, the case of *Osborn* v. *Bank of the United States* is cited with approval, as establishing these, among other propositions: 'Where the State is concerned, the State should be made a party, if it can be done. That it cannot be done is a sufficient reason for the omission to do it, and the court may proceed to decree against the officers of the State in all respects as if the State were a party to the record. In deciding who are parties to the suit, the court will not look beyond the record. Making a state officer a party does not make the State a party, *although her law may have prompted his action, and the State may stand behind him as a real party in interest.* A State can be made a party only by shaping the bill expressly with that view, as where individuals or corporations are intended to be put in that relation to the case.' Though not prepared to say now that the court can proceed against the officer 'in all respects' as if the State were a party, this may be taken as intimating, in a general way, the views of the court at that time."

In *Poindexter* v. *Greenhow*, 114 U. S. 270, we sustained a suit by a private individual against a treasurer, charged with the duty of collecting taxes, to recover certain personal property which the defendant had seized for the non-payment of taxes due Virginia from the plaintiff in that suit. In seizing the property the officer disregarded the tender, previously made, of the State's coupons. It was earnestly contended that, as the officer only did what the State by her statutes had commanded him to do, and had himself no personal interest in the matter, the suit against him was, in legal effect, one against the State; that a suit to recover property seized for the non-payment of taxes, in conformity with the statutes of Virginia, had the same result as a direct suit against the State to compel her performance of her contract with the coupon holder, or to enjoin her officer from carrying those statutes into effect. But this view was overruled, mainly upon the authority of *Osborn* v. *Bank of the United States*, from which the court

quoted, with approval, the same passages as are to be found in
the opinion in Lee's case, and in reference thereto observed:
"This language, it may be observed, was quoted with approval
in *United States* v. *Lee*. The principle which it enunciates
constitutes the very foundation upon which the decision in that
case rested." In Poindexter's case we said that the immunity
from suit secured to the States by the Constitution "does not
exempt the State from the operation of the constitutional pro-
vision that no State shall pass any law impairing the obliga-
tion of contracts; for, it has long been settled that contracts
between a State and an individual are as fully protected by the
Constitution as contracts between two individuals. It is true,
that no remedy for a breach of its contract by a State, by way
of damages as compensation, or by means of process to compel
its performance, is open, under the Constitution, in the courts
of the United States, by a direct suit against the State itself, on
the part of the injured party, being a citizen of another State,
or a citizen or subject of a foreign state. But it is equally
true, that whenever, in a controversy between parties to a suit,
of which these courts have jurisdiction, the question arises upon
the validity of a law by a State impairing the obligation of its
contract, *the jurisdiction is not thereby ousted, but must be ex-
ercised*, with whatever legal consequences to the rights of the
litigants may be the result of the determination."

Upon identically the same grounds rests our decision in
*Allen* v. *Baltimore & Ohio Railroad*, 114 U. S. 311, in which
we maintained the right of that company to an injunction to
prevent the collection of taxes by distraint upon its property
after a tender of the State's tax-receivable coupons in payment
of such taxes. That suit was against the Auditor of Public
Accounts and the Treasurer of Virginia. They certainly had
no personal interest in the collection of the taxes, but were
only obeying the statutes of the State which they assumed to
be constitutional and binding upon them. But the effect of
that suit was to say to the State of Virginia that she should
not collect her revenue in the mode proposed by the statute,
and thereby violate rights secured by the Constitution of the
United States. In vain was it urged by the officers of the

State that Virginia was the real party in interest; that, as the State could only act by her officers, to enjoin them was to enjoin the State; and that consequently the suit was one against the State within the meaning of the Eleventh Amendment. This court overruled that contention, holding, in substance, that, the State of Virginia not being named as a party, and it being impossible to make her a party, her officers could be prevented from touching the property of the railroad under a statute void under the Constitution of the United States.

The result, then, of former decisions is: That a suit against officers of the United States to recover property not legally in their possession, is not a suit against the United States; and that neither a suit against officers of the State to recover property illegally taken by them, in obedience to the statutes of the State, nor a suit brought against state officers to enjoin them from taking, under the command of the State, the property of a tax-payer who has tendered coupons for taxes due to her, were suits against the State within the meaning of the 11th Amendment of the Constitution. And now it is adjudged, in the cases before us, that a suit merely against state officers to enjoin them from bringing actions against tax-payers who have previously tendered tax-receivable coupons is a suit against the State. There is, I grant, a difference between the cases heretofore decided and the case of *Cooper* v. *Marye;* but the difference is not such as to involve the jurisdiction of the Circuit Court, but, rather, to use the language of Chief Justice Marshall, "the exercise of its jurisdiction."

The Commonwealth of Virginia has no more authority to enact statutes impairing the obligation of her contracts than statutes impairing the obligation of contracts exclusively between individuals. *State of New Jersey* v. *Wilson,* 7 Cranch, 164, 166; *Providence Bank* v. *Billings,* 4 Pet. 514, 560; *Green* v. *Biddle,* 8 Wheat. 1, 84; *Woodruff* v. *Trapnall,* 10 How. 190, 207; *Wolff* v. *New Orleans,* 103 U. S. 358, 367; *New Orleans Gas Co.* v. *Louisiana Light Co.,* 115 U. S. 650, 673. A statute which is void, as impairing the obligation of the State's contract, affords no justification to any one, and confers no authority. If an officer proposes to enforce such a

statute against a party, the obligation of whose contract is sought to be impaired, the latter, in my judgment, may proceed, by suit, against such officer, and thereby obtain protection in his rights of contract, as against the proposed action of that officer. A contrary view enables the State to use her immunity from suit to effect what the Constitution of the United States forbids her from doing, namely, to enact statutes impairing the obligation of her contract. If an officer of the State can take shelter behind such immunity while he proceeds with the execution of a void enactment to the injury of the citizen's rights of contract, it would look as if that provision which declares that the Constitution of the United States shall be the supreme law of the land, anything in the constitution or laws of a State to the contrary notwithstanding, had lost most, if not all, of its value in respect to contracts which a State makes with individuals.

I repeat, that the difference between a suit against officers of the State, enjoining them from seizing the property of the citizen, in obedience to a void statute of the State, and a suit enjoining such officers from bringing under the order of the State, and in her name, an action which, it is alleged, will result in injury to the rights of the complainant, is not a difference that affects the jurisdiction of the court, but only its exercise of jurisdiction. If the former is not a suit against the State, the latter should not be deemed of that class.